JONATHAN V. GOULD (DC Bar No. 477569)
Senior Deputy Comptroller and Chief Counsel
BAO NGUYEN (NC Bar No. 39946)
Principal Deputy Chief Counsel
GREGORY F. TAYLOR (DC Bar No. 417096)
Director of Litigation
PETER C. KOCH (IL Bar No. 6225347)
Assistant Director of Litigation
ASHLEY W. WALKER (DC Bar No. 488126)
Counsel
ALISSA V. SAGRI (MD No. 0812180099)
Counsel
AMBER N. MELTON (MD No. 1405200002)
Counsel
HANNAH E. HICKS (AL Bar No. 9577S61W)
Attorney

      Office of the Comptroller of the Currency
      400 7th Street, SW
      Washington, D.C. 20219
      Telephone: (202) 649-6300
      Facsimile: (202) 649-5709
      ashley.walker@occ.treas.gov

*Attorneys for Defendants*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| NATIONAL COMMUNITY REINVESTMENT COALITION; CALIFORNIA REINVESTMENT COALITION, | ) ) ) ) CASE NO. 20-cv-04186-SK |
| Plaintiffs, | ) ) **DEFENDANTS' NOTICE OF MOTION AND** |
| v. | ) **MOTION TO DISMISS PLAINTIFFS'** ) **COMPLAINT** ) |
| OFFICE OF THE COMPTROLLER OF THE CURRENCY and BRIAN BROOKS, in his official capacity as Acting Comptroller of the Currency, | ) Date: October 5, 2020 ) Time: 9:30 a.m. ) Place: Courtroom C, 15th Floor ) Before: Magistrate Judge Sallie Kim ) ) |
| Defendants. | ) ) |

**<u>TABLE OF CONTENTS</u>**

NOTICE OF MOTION AND MOTION TO DISMISS .....................................................1

STATEMENT OF THE ISSUES...................................................................................1

RELIEF SOUGHT......................................................................................................1

MEMORANDUM OF POINTS AND AUTHORITIES ..................................................1

I.      INTRODUCTION ...........................................................................................1

II.     BACKGROUND .............................................................................................3

        A.      Statutory Background ........................................................................3

        B.      Regulatory Background .....................................................................4

                1.      Clarification and Expansion of CRA Qualifying Activities ...........4

                2.      Requirement to Delineate Deposit-Based Assessment Areas................6

                3.      More Objective General Performance Standards ......................6

                        (i)     Retail Lending Distribution Tests.................................7

                        (ii)    CRA Evaluation Measure and CD Minimum.................7

                        (iii)   Performance Context ...................................................8

                4.      Greater Transparency from Timely and Meaningful Data Disclosure ..................9

III.    PLAINTIFFS' COMPLAINT..........................................................................10

IV.     LEGAL STANDARDS ..................................................................................10

V.      ARGUMENT ................................................................................................12

        A.      Plaintiffs Lack Standing to Pursue This Action................................12

                1.      Plaintiffs Lack Organizational Standing................................12

                        (i)     Plaintiffs Do Not Identify an Actual Diversion of Resources to
                                Prevent an Actual Injury .............................................13

                        (ii)    Rather than Frustrate Plaintiffs' Missions, the Final Rule
                                Provides New Opportunities for Plaintiffs...................14

                2.      Plaintiffs Lack Associational Standing...................................15

                3.      Plaintiffs Fail to Identify a Cognizable Informational Injury with
                        Regard to the Final Rule's Data Disclosure Provisions.........16

4.     Plaintiffs' Alleged Injury from Reduced CRA Activities Benefitting LMI Communities Is Not Traceable to the OCC and Is Speculative ..................18

5.     Plaintiffs' Alleged Injuries Are Speculative and Unripe Because Performance Benchmarks and Thresholds Have Not Yet Been Finalized...........................................................................................21

B.    Plaintiffs' Claims Are Not Within the Zone of Interests Protected by CRA ...................23

1.     Plaintiffs' Interests Are Insufficiently Related to CRA ....................23

2.     Plaintiffs' Interest in Uniformity Across Agencies' Regulations Conflicts with the Statute's Flexibility ................................24

C.    In the Alternative, the Complaint Is Subject to Dismissal, in Part, for Failure to State a Claim of Unlawfulness Under the APA...........................................25

1.     No Aspect of the Final Rule Is in Excess of Statutory Authority or Limitations .............................................................26

(i)     Plaintiffs Baselessly Infer a Prohibition on Using Ratios.........................27

(ii)    The Final Rule's Approach for Assigning Ratings Is Consistent with Statute ................................................28

(iii)   The Final Rule's Treatment of Deposit-Taking ATMs Satisfies Statutory Requirements..............................................29

2.     Plaintiffs Fail to State a Claim of Frustration of Statutory Purpose Concerning Redlining, LMI Communities, and Communities of Color ..............29

3.     The Former Comptroller's Alleged Pre-Rulemaking "Viewpoints" Do Not Support a Cognizable Theory of Unlawful Bias or Prejudgment ..................32

CONCLUSION....................................................................................................33

<u>Cases</u>

*Air Courier Conference of Am. v. Am. Postal Workers Union AFL-CIO*, 498 U.S. 517 (1991).............. 24

*Alaska Factory Trawler Ass'n v. Baldridge*, 831 F.2d 1456 (9th Cir. 1987)........................... 32

*Am. Diabetes Ass'n v. U.S. Dep't of the Army*, 938 F.3d 1147 (9th Cir. 2019) .......................... 12, 13, 15

*Animal Legal Defense Fund v. U.S. Dep't of Agric.* ("*ALDF*"), 935 F.3d 858 (9th Cir. 2019) .............. 16

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ....................................................... 11

*Ass'n of Nat'l Advertisers, Inc. v. Fed. Trade Comm'n*, 627 F.2d 1151 (D.C. Cir. 1979)...................... 32

*Associated Gen. Contractors of Am., San Diego Chapter, Inc. v. Cal. Dep't of Transp.*, 713 F.3d 1187

    (9th Cir. 2013)........................................................ 15

*Balistreri v. Pacifica Police Dep't*, 901 F.2d 696 (9th Cir. 1990) ................................ 25, 26, 30

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ........................................... 11, 20

*California v. Azar*, 911 F.3d 558 (9th Cir. 2018) ................................................ 12

*Chandler v. State Farm Mut. Auto. Ins. Co.*, 598 F.3d 1115 (9th Cir. 2010) ......................... 10

*City & County of San Francisco v. U.S. Citizenship & Immigration Servs.*, 408 F. Supp. 3d 1057 (N.D.

    Cal. 2019), *appeal dismissed sub nom. La Clinica de La Raza, Inc. v. Trump*, No. 19-17483, 2020 WL

    1170719 (9th Cir. Feb. 4, 2020)........................................... 23

*Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388 (1987) ...................................... 11, 23, 25

*Colwell v. Dep't of Health & Human Servs.*, 558 F.3d 1112 (9th Cir. 2009) ........................ 22

*Corning Sav. & Loan Ass'n v. FHLBB*, 571 F. Supp. 396 (E.D. Ark. 1983).......................... 26

*Ctr. for Biological Diversity v. Bernhardt,* 946 F.3d 553 (9th Cir. 2019)....................... passim

*Ctr. for Envtl. Health v. Perdue*, No. 18-CV-1763-RS, 2018 WL 9662437 (N.D. Cal. Aug. 21, 2018) 26,

    27, 29

*East Bay Sanctuary Covenant v. Trump*, 932 F.3d 742 (9th Cir. 2018) .......................... 23, 24

*Exch. Bank v. Dir. of the Office of Thrift Supervision*, 29 F. Supp. 2d 1272 (N.D. Okla. 1998) ....... 23, 25

*FEC v. Akins*, 524 U.S. 11 (1998).............................................................. 16

*Friends of Animals v. Jewell*, 828 F.3d 989 (D.C. Cir. 2016) ............................................ 12, 16

*Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982) ........................................................ 13

*Hicks v. Resolution Trust Corp.*, 970 F.2d 378 (7th Cir. 1992) ........................................... 31

*In re Coleman*, 560 F.3d 1000 (9th Cir. 2009) ........................................................ 10, 21, 22

*Johnson v. Riverside Healthcare Sys. LP*, 534 F.3d 1116 (9th Cir. 2008) ........................... 11

*La Asociacion de Trabajadores de Lake Forest v. City of Lake Forest,* 624 F.3d 1083 (9th Cir. 2010) 13, 14

*Lead Indus. Ass'n, Inc. v. Envt'l Prot. Agency*, 647 F.2d 1130 (D.C. Cir. 1980)................... 33

*Lee v. Bd. of Governors of the Fed. Reserve Sys.*, 118 F.3d 905 (2d Cir. 1997) ........... 23, 24, 26

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014)......................... 23

*Lujan v. Defs. of Wildlife*, 504 U.S. 555 (1992) ......................................................... 10, 17, 18

*Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871 (1990) ........................................................ 11, 23

*Nat'l Council of La Raza v. Cegavske*, 800 F.3d 1032 (9th Cir. 2015)................................... 13

*Nat'l Educ. Ass'n v. DeVos*, 345 F. Supp. 3d 1127 (N.D. Cal. 2018) ................................... 17

*Navarro v. Block*, 250 F.3d 729 (9th Cir. 2001) ................................................................. 11

*Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55 (2004)........................................... 26, 27

*Nuclear Info. & Res. Serv. v. Nuclear Regulatory Comm'n*, 457 F.3d 941 (9th Cir. 2006) ....... 21

*People for the Ethical Treatment of Animals, Inc. v. USDA*, 7 F. Supp. 3d 1 (D.D.C. 2013) ............... 26

*Powell v. Am. Gen. Fin., Inc.*, 310 F. Supp. 2d 481 (N.D.N.Y. 2004) ................................... 26

*Principal Life Ins. Co. v. Robinson*, 394 F.3d 665 (9th Cir. 2005)................................... 21, 22

*Serv. Women's Action Network v. Mattis*, 352 F. Supp. 3d 977 (N.D. Cal. 2018)................... 13

*Spokeo, Inc. v. Robins*, 136 S. Ct. 1540 (2016) ....................................................... 2, 10, 12

*Sprewell v. Golden State Warriors*, 266 F.3d 979 (9th Cir. 2001) ................................... 11, 31

*State v. Bureau of Land Mgmt.*, 286 F. Supp. 3d 1054 (N.D. Cal. 2018) ............................. 32

*Summers v. Earth Island Inst.*, 555 U.S. 488 (2009) ........................................................... 15

*SurvJustice, Inc. v. DeVos*, No. 18-CV-535-JSC, 2018 WL 4770741 (N.D. Cal. Oct. 1, 2018)............. 27

*SurvJustice, Inc. v. DeVos*, No. 18-CV-535-JSC, 2019 WL 1434144 (N.D. Cal. Mar. 29, 2019).......... 27

*Thomas v. Anchorage Equal Rights Comm'n*, 220 F.3d 1134 (9th Cir. 2000) .......................................... 21

*Town of Chester, N.Y. v. Laroe Estates, Inc.*, 137 S. Ct. 1645 (2017) ...................................... 10

*United States v. Corinthian Colls.*, 655 F.3d 984 (9th Cir. 2011) ...................................... 11

*United Steelworkers of Am., AFL-CIO-CLC v. Marshall*, 647 F.2d 1189 (D.C. Cir. 1980) ................... 32

*White v. Lee*, 227 F.3d 1214 (9th Cir. 2000) ........................................................... 11

*Wilderness Soc'y Inc. v. Rey*, 622 F.3d 1251 (9th Cir. 2010) ................................................. 16

## Statutes

12 U.S.C. §§ 1 *et seq*. ............................................................................................... 3

Administrative Procedure Act ("APA"), 5 U.S.C. § 702 .......................................... 10, 11

APA, 5 U.S.C. § 706 ............................................................................................ 25

Community Reinvestment Act of 1977 ("CRA"), 12 U.S.C. §§ 2901 *et seq*. ....................... 2, 3

CRA, 12 U.S.C. § 2901 ........................................................................................ 23

CRA, 12 U.S.C. § 2902 ........................................................................................ 3, 4

CRA, 12 U.S.C. § 2903 ........................................................................................... 4

CRA, 12 U.S.C. § 2905 ........................................................................................... 3

CRA, 12 U.S.C. § 2906 ................................................................................... passim

Dodd-Frank Wall Street Reform and Consumer Protection Act, 12 U.S.C. §§ 5411-5413 ............... 25

Equal Credit Opportunity Act, 15 U.S.C. §§ 1691 *et seq*. ............................................ 31

Fair Housing Act, 42 U.S.C. §§ 3601 *et seq*. ............................................................ 31

International Banking Act of 1978, 12 U.S.C. § 3103 .......................................................... 3

## Rules

Fed. R. Civ. P. 12(b)(1) .......................................................................... 1, 10, 11

Fed. R. Civ. P. 12(b)(6) .................................................................................. passim

## Regulations

12 C.F.R. § 25.03 ........................................................................................ passim

| | |
|---|---|
| 12 C.F.R. § 25.04 | 5, 19, 20, 31 |
| 12 C.F.R. § 25.05 | 5, 6, 14 |
| 12 C.F.R. § 25.06 | 14 |
| 12 C.F.R. § 25.08 | 5, 14, 20, 31 |
| 12 C.F.R. § 25.09 | 6, 29, 30 |
| 12 C.F.R. § 25.10 | 6, 7 |
| 12 C.F.R. § 25.11 | 8 |
| 12 C.F.R. § 25.12 | 5, 7 |
| 12 C.F.R. § 25.13 | 8, 28 |
| 12 C.F.R. § 25.16 | 8, 9, 14, 31 |
| 12 C.F.R. § 25.17 | 31 |
| 12 C.F.R. § 25.27 | 9 |
| 12 C.F.R. Part 25, Subpart B | 4 |
| 12 C.F.R. Part 25, Subpart C | 6 |
| 12 C.F.R. Part 25, Subpart D | 6 |
| 12 C.F.R. Part 25, Subpart E | 15 |
| CRA, 1993 Joint Notice of Proposed Rulemaking, 58 Fed. Reg. 67,466 (Dec. 21, 1993) | 17 |
| CRA, 1995 Joint Final Regulations, 60 Fed. Reg. 22,156 (May 4, 1995) | 17 |
| CRA, Final Regulations ("Final Rule"), 85 Fed. Reg. 34,734 (June 5, 2020) | passim |
| CRA, Interagency Q&As Regarding Community Reinvestment; Guidance, 81 Fed. Reg. 48,506 (July 25, 2016) | 19 |
| CRA, Joint Notice of Proposed Rulemaking ("JNPR"), 85 Fed. Reg. 1204 (Jan. 9, 2020) | 4, 6 |
| CRA, Reforming the CRA Regulatory Framework, Advanced Notice of Proposed Rulemaking, 83 Fed. Reg. 45,053 (Sept. 5, 2018) | 4 |
| *Former OCC CRA Regulations*, 12 C.F.R. § 195.12 (1-1-20 ed.) | 19 |
| *Former OCC CRA Regulations*, 12 C.F.R. § 195.21 (1-1-20 ed.) | 8 |
| *Former OCC CRA Regulations*, 12 C.F.R. § 195.22 (1-1-20 ed.) | 7 |

*Former OCC CRA Regulations*, 12 C.F.R. § 195.26 (1-1-20 ed.).......................................................7

*Former OCC CRA Regulations*, 12 C.F.R. § 195.28 (1-1-20 ed.).......................................................8

*Former OCC CRA Regulations*, 12 C.F.R. § 195.42 (1-1-20 ed.).......................................................9

*Former OCC CRA Regulations*, 12 C.F.R. § 25.12 (1-1-20 ed.)........................................................19

*Former OCC CRA Regulations*, 12 C.F.R. § 25.21 (1-1-20 ed.)...................................................8, 15

*Former OCC CRA Regulations*, 12 C.F.R. § 25.22 (1-1-20 ed.)........................................................7

*Former OCC CRA Regulations*, 12 C.F.R. § 25.26 (1-1-20 ed.)...................................................7, 27

*Former OCC CRA Regulations*, 12 C.F.R. § 25.28 (1-1-20 ed.)........................................................8

*Former OCC CRA Regulations*, 12 C.F.R. § 25.42 (1-1-20 ed.)........................................................9

*Former OCC CRA Regulations*, 12 C.F.R. Part 195, Subpart B (1-1-20 ed.) ............................................7

*Former OCC CRA Regulations*, 12 C.F.R. Part 25, Subpart B (1-1-20 ed.) .............................................7

*Former OCC CRA Regulations*, Appendices A to 12 C.F.R. Parts 25 and 195 (1-1-20 ed.) ................7, 8

OTS, CRA-Interagency Uniformity, 2007 Final Regulations, 72 Fed. Reg. 13,429-01 (Mar. 22, 2007) 25

Other Authorities

123 Cong. Rec. Sen. 17,625-37 (Jun. 6, 1977) ........................................................................ 27

Gregory J. Hudson and Kory Killgo, *Community Banks are Flipping Over a State Charter*, Dallas Fed
    Financial Insights, First Quarter 2017, *available at*
    https://www.dallasfed.org/~/media/documents/outreach/fi/2017/fi1701.pdf ...................................... 20

Hearings Before the S. Comm. on Banking, Housing, and Urban Affairs, U.S. Senate 95-1 (Mar. 23-25,
    1977) .................................................................................................................. 28

*Interagency Fair Lending Examination Procedures* (Aug. 2009), *available at*
    https://www.ffiec.gov/pdf/fairlend.pdf ................................................................................ 32

*Large Institution CRA Examination Procedures OCC, FRB, and FDIC* (Apr. 2014) ("CRA Large Bank
    Exam Procedures"), *available at* https://www.ffiec.gov/cra/pdf/cra_exlarge.pdf........................... 7, 29

## NOTICE OF MOTION AND MOTION TO DISMISS

PLEASE TAKE NOTICE that on October 5, 2020, at 9:30 a.m., or as soon thereafter as the matter may be heard, in Courtroom C, 15th Floor, of the United States Courthouse, 450 Golden Gate Avenue, San Francisco, California, before the Honorable Sallie Kim, United States Magistrate Judge, the United States Office of the Comptroller of the Currency and Acting Comptroller of the Currency Brian Brooks (collectively "OCC") will move this Court for dismissal of Plaintiffs' Complaint for Declaratory and Injunctive Relief, ECF No. 1 ("Compl."), pursuant to Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction and for lack of ripeness. The OCC will also move this Court, pursuant to Federal Rule of Civil Procedure 12(b)(6), for dismissal of Plaintiffs' Complaint as their claims do not fall within the zone of interests protected by the relevant statute. In the alternative, the OCC will move this Court for dismissal of Count One of the Complaint, in part, pursuant to Rule 12(b)(6), for failure to state a claim upon which relief may be granted. This motion is based on this notice and motion, the accompanying memorandum of points and authorities, the Court's files and records in this matter, and any other matters of which the Court takes judicial notice.

## STATEMENT OF THE ISSUES

Whether Plaintiffs have standing to bring suit under Article III of the U.S. Constitution, whether Plaintiffs' claims are constitutionally and prudentially ripe, whether Plaintiffs' claims fall within the zone of interests of the Community Reinvestment Act, and whether Plaintiffs state a claim for which relief may be granted.

## RELIEF SOUGHT

The OCC seeks an order dismissing the Complaint without leave to amend.

## MEMORANDUM OF POINTS AND AUTHORITIES

I.    INTRODUCTION

The National Community Reinvestment Coalition ("NCRC") and the California Reinvestment Coalition ("CRC") (collectively "Plaintiffs") raise this challenge to regulations promulgated by the OCC, Final Rule, 85 Fed. Reg. 34,734 (June 5, 2020) ("Final Rule" or "FR"), that strengthen and modernize the implementation of the Community Reinvestment Act of 1977 ("CRA"), Public Law 95-

128, 91 Stat. 1147, *codified at* 12 U.S.C. §§ 2901 *et seq.* The Final Rule seeks to encourage and incent the financial institutions subject to the OCC's jurisdiction (collectively "banks") to better serve the needs of their entire communities, including low- and moderate-income ("LMI") and other communities of need. The OCC's Final Rule enhances the incentives for banks to meet the needs of their communities by providing greater clarity, objectivity, and transparency regarding the types of bank activities that qualify for CRA credit, where they will be counted, how performance will be measured and rated, and requirements for timely and transparent reporting. FR 34,734.

Plaintiffs misread the statutory text and legislative history to assert incorrectly that the approach taken by the OCC exceeds its authority or is contrary to the purpose of CRA. The CRA statute is broadly phrased, and Congress largely left it to the OCC and the other Federal financial supervisory agencies who administer the statute to use their expertise to fashion rules that they determine present the best approach for encouraging regulated financial institutions to meet the needs of their entire communities. The Court should conclude that the Final Rule falls well within the bounds of the OCC's authority and dismiss Count One, in part, for failure to state a claim.

However, Plaintiffs' Complaint suffers from more basic threshold flaws. The Court lacks subject matter jurisdiction to hear this case because Plaintiffs lack standing. Neither NCRC nor CRC can establish that they have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). In terms of direct harm, Plaintiffs allege that changes to the Final Rule's public disclosure provisions will limit their access to previously-available data regarding certain lending activities. But in order to be justiciable, such an injury must be premised on an existing legal right to information, and no such right exists.

Plaintiffs' more generalized argument – asserted primarily on behalf of their members – is that the Final Rule will result in banks choosing to engage in CRA activities in ways that will reduce the benefit to LMI communities. These claims should suffer a similar fate; there is no concrete injury-in-fact. Moreover, given that (1) the alleged harms are based on the hypothetical and implausible actions of third-party banks not traceable to the Final Rule, and (2) the necessary benchmarks and thresholds that

the OCC will use for assessing banks' performance – an important driver of how banks may respond to the Final Rule – have not been adopted and will be the subject of a subsequent rulemaking, the Court should conclude that any allegation of injury premised on unmanifested harm is speculative at best. At minimum, these claims should be deemed unripe.

The Complaint is also subject to dismissal in its entirety because Plaintiffs' interests, including their stated interest in the other Federal financial supervisory agencies issuing identical regulations, are outside CRA's zone of interests. Finally, as a matter of law, the alleged pre-rulemaking views of the former Comptroller of the Currency provide no cognizable basis for a claim of unlawful bias or prejudgment.

## II.     BACKGROUND

The OCC is an independent bureau of the United States Department of Treasury whose mission is to charter, regulate, and supervise national banks and federal savings associations, as well as federal branches and agencies of foreign banks, to assure their safety and soundness, and compliance with laws and regulations, fair access to financial services, and fair treatment of customers. 12 U.S.C. §§ 1 *et seq*.

### A.     Statutory Background

The Community Reinvestment Act promotes access to credit by requiring the OCC and the other Federal financial supervisory agencies to encourage the financial institutions that they respectively regulate to serve their entire communities in which they operate. 12 U.S.C. §§ 2901-03. Each agency shall publish regulations to carry out the purposes of CRA. *Id*. at § 2905. The OCC has CRA rulemaking authority for certain banks, including national banks as well as both federal and state savings associations.[1] *Id*. at §§ 2902(1)(A), 2905. Following examination of an institution, an agency must prepare a written CRA performance evaluation ("PE") that states its conclusions under the regulatory assessment factors, discusses the facts and data supporting such conclusions, and describes the basis for

---

[1] The term "bank" as used herein shall refer to any federal or state savings association, national bank, or uninsured federal branches that result from an acquisition described in section 5(a)(8) of the International Banking Act of 1978 (12 U.S.C. § 3103(a)(8)(applying CRA to certain branches acquired by foreign banks)).

1    rating the institution's CRA performance either "Outstanding," "Satisfactory," "Needs to improve," or
2    "Substantial noncompliance." *Id.* at §§ 2903, 2906. This record is "taken . . . into account" in an
3    agency's "evaluation of an application for a deposit facility," such as an application for a charter,
4    branch, branch relocation, or merger, by a bank. *Id.* at §§ 2902(3), 2903(a)(2).

**B.      Regulatory Background**

6        Following a decade of inter-agency reform initiatives and the OCC's issuance of an Advanced
7    Notice of Proposed Rulemaking, 83 Fed. Reg. 45,053 (Sept. 5, 2018), the OCC and Federal Deposit
8    Insurance Corporation ("FDIC") issued a Joint Notice of Proposed Rulemaking, 85 Fed. Reg. 1204 (Jan.
9    9, 2020) ("JNPR"), the first proposal to undertake significant CRA modernization since 1995. Following
10   consideration of public comments, the OCC finalized an updated regulatory framework. Final Rule, 85
11   Fed. Reg. 34,734 (June 5, 2020) ("Final Rule" or "FR"). The Final Rule (1) clarifies what activities
12   qualify for CRA credit; (2) updates how banks delineate areas to be assessed for CRA performance; (3)
13   improves the evaluation process to be more objective; and (4) provides for more transparent and timely
14   reporting. *Id.* These changes address certain shortcomings of the previous outdated regulations, which,
15   as implemented, were inconsistent, opaque, and overly subjective. FR 34,736. The Final Rule promotes
16   greater accountability through more objective ratings and improved ability to determine a bank's level of
17   performance. FR 34,737. Additionally, the changes are designed to better incent banks to engage in
18   activities that serve the needs of their entire communities, including LMI neighborhoods. FR 34,734-36.

**1.      Clarification and Expansion of CRA Qualifying Activities**

20       Through detailed qualifying activities criteria, the Final Rule clarifies and expands what banking
21   activities count for CRA credit. *See* 12 C.F.R. Part 25, Subpart B.[2] Contrary to the impression that
22   Plaintiffs seek to create about the impact of the Final Rule, the changes do not present a wholesale
23   abandonment of what has gone before. For example, with some updates, banks will continue to receive
24   CRA credit for retail loans, including:

---

26   [2] Herein, the provisions of the Final Rule are cited using the new C.F.R. citations that will become
27   effective on October 1, 2020. As of the filing of this brief, this regulation text appears at 85 Fed. Reg.
     34,792-809. Citations to the *previous* regulations are denoted by the C.F.R. edition date "1-1-20."
28

- home mortgage and consumer loans to LMI individuals or families;
- small loans to businesses and farms ("SLBF")[3] that are provided to CRA-eligible businesses and farms;[4] and
- SLBF to borrowers located in LMI census tracts.

*See* 12 C.F.R. § 25.04(b). With additional clarifications—many drawn from existing guidance—the Final Rule continues to provide CRA credit for community development ("CD") loans, investments, and services that support affordable housing, community support services, and economic development, as well as essential community facilities and essential infrastructure primarily serving LMI individuals and census tracts and other areas of need, in addition to other CD activities advancing the purposes of CRA. 12 C.F.R. § 25.04(c).

      The Final Rule also continues to address the needs of LMI communities, and enhances that focus by, *inter alia*, (1) disallowing dollar-based credit for loans to *middle- and upper-income borrowers* in LMI census tracts, while continuing to give credit for the geographic distribution of all home mortgage lending in LMI areas, FR 34,735, 34,740; (2) providing credit at the bank level for qualifying activities, including those benefitting LMI individuals and areas, outside of a bank's assessment areas, FR 34,758-60; and (3) providing multipliers that enhance credit for and incent particularly valuable activities, such as affordable housing-related CD loans and retail loans generated by branches in LMI census tracts, FR 34,755. *See* 12 C.F.R. §§ 25.04(a)(3), 25.08; 25.12(b).

      Additional certainty on what counts for CRA credit will be provided by a new "publicly available, non-exhaustive, illustrative list of examples of qualifying activities." FR 34,378; 12 C.F.R. § 25.05. Banks and other interested parties will be able to submit a form to seek agency confirmation that an activity "is confirmed to be or determined not to be a qualifying activity." FR

---

[3] SLBFs are defined as no greater than $1.6 million. 12 C.F.R. § 25.03.

[4] CRA-eligible businesses and farms have gross annual revenues of no greater than $1.6 million. 12 C.F.R. § 25.03.

DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS PLAINTIFFS' COMPLAINT
CASE NO. 20-cv-04186-SK

34,379. The illustrative list[5] will be updated on a periodic basis and through public notice and comment "no less frequently than every five years." 12 C.F.R. § 25.05(d).

### 2. Requirement to Delineate Deposit-Based Assessment Areas

The Final Rule expands the regulatory concept of a bank's "community" for purposes of CRA beyond the facility-based geographic areas mandated in the current regulations, *i.e.* locations tied to where a bank maintains, for example, its main office and branches. 12 C.F.R. Part 25, Subpart C. For a bank that receives 50% or more of its retail domestic deposits outside of its facility-based assessment areas, performance will now also be assessed in areas from where it receives 5% or more of the bank's deposits. 12 C.F.R. § 25.09(c). This change recognizes the evolution in banking, including the emergence of internet banks, and will incent banks to better meet credit needs in areas where they collect deposits. FR 34,756-58.

### 3. More Objective General Performance Standards

The previous regulations provided different methods to evaluate a bank's CRA performance depending on a bank's size and business strategy, focusing primarily on evaluation of all or a portion of its retail lending and community development activities through the application of lending, investment, and service tests, as well as assessment of a bank's performance context. JNPR 1217. The exact parameters and process in application of these tests were left unspecified in the previous regulations, resulting in a highly subjective overall framework. *Id*. The Final Rule addresses criticism that this approach relies too heavily on subjective standards, a situation that sometimes resulted in inconsistent application of examiner judgment and insufficient correlation between ratings and the level of CRA activities across the industry. FR 34,762. These criticisms are addressed by adopting more objective "general performance standards" to evaluate compliance with the CRA for the largest banks. 12 C.F.R. Part 25, Subpart D.[6] This more robust regulatory framework, with multiple methods of quantitative

---

[5] The illustrative list is publicly available on the OCC's website, FR 34,749-50, at https://www.occ.gov/topics/consumers-and-communities/cra/cra-qualifying-activities.pdf.

[6] The Final Rule's general performance standards apply to banks with assets above $2.5 billion. 12 C.F.R. § 25.10. Smaller banks and wholesale and limited purpose banks will be evaluated under separate

assessment, as well as appropriate qualitative evaluation, will increase objectivity, consistency, and transparency in CRA evaluations and ratings, which will be more reliable, reproducible, and comparable over time. FR 34,735, 34,763, 34,770.

### (i)  Retail Lending Distribution Tests

Under the previous regulations, The OCC's bank examiners evaluated a bank's retail lending activity in part using distribution tests. FR 34,762. These tests, however, were not described in detail in the regulatory text, *see* 12 C.F.R. §§ 25.22, 25.26, 195.22, 195.26 & Appendices A (1-1-20 ed.), but instead were generally described in guidance published by the agencies.[7] The Final Rule introduces clarity by prescribing specific retail lending distribution tests that measure the geographic and borrower distributions within a bank's assessment areas of certain qualifying retail loans made in LMI census tracts, and to LMI borrowers and CRA-eligible farms and businesses. FR 34,736, 34,765; 12 C.F.R. § 25.12. The OCC will specify the numeric thresholds to satisfy these tests in a subsequent rulemaking. FR 34,774.

### (ii)  CRA Evaluation Measure and CD Minimum

The Final Rule imposes greater transparency, objectivity and accountability in measuring the impact of a bank's CRA qualifying activities. Under the previous framework, in practice the OCC assessed the impact of a bank's CRA activities by examining the dollar value of retail lending activities and level of CD lending and investment. FR 34,762. Although under interagency-guidance examiners used empirical data in assessing a bank's level of CRA activity,[8] the prior regulations themselves did not contain such detailed requirements. *See* 12 C.F.R. §§ 25.22-25.26, 195.22-195.26 (1-1-20 ed.) (describing generally more qualitative criteria). Similarly, the assigned ratings under the prior

---

standards substantially similar to the preexisting regulations, or may opt in to the Final Rule's general performance standards. *Id.* Banks may also submit strategic plans with alternative performance evaluation provisions for OCC consideration. *Id.*; *see also id.* § 25.03 (FR 34,794-96).

[7] *See, e.g., Large Institution CRA Examination Procedures OCC, FRB, and FDIC* (Apr. 2014), pp. 5-10, *available at* https://www.ffiec.gov/cra/pdf/cra_exlarge.pdf ("CRA Large Bank Exam Procedures").

[8] *See, e.g., id.* p. 6.

regulations were based upon a subjective analysis that largely relied on examiner judgment. *See* 12 C.F.R. §§ 25.28, 195.28 & Appendices A – Ratings (1-1-20 ed.).

The Final Rule's CRA evaluation measure, for banks subject to the general performance standards, will transparently assess the impact of a bank's CRA qualifying activities using objectively measurable data by taking the *sum of*: (1) a bank's annual CRA qualifying activities value *divided by* the average of the bank's quarterly retail domestic deposits; and (2) a calculation of the bank's distribution of branches serving LMI and other areas of need, both at the assessment area level and at the overall bank level. 12 C.F.R. § 25.11. The general performance standards also include a separate requirement, at the assessment area and bank level, for minimum CD lending and investment. 12 C.F.R. § 25.13 (c)(1)(iii), (c)(2)(iii), (d)(1)(iii), (d)(2)(iii). These multiple measures ensure that the overall "framework continues to "incentivize important (and at times smaller dollar value) activities." FR 34,763.

Banks may achieve "presumptive performance ratings" of "Outstanding" or "Satisfactory" based on meeting or exceeding specific performance standards for the CRA evaluation measure calculations and CD minimum, as well as the retail lending distribution tests for assessment areas. 12 C.F.R. § 25.13. Banks that fail to meet the CD minimum or pass the retail lending distribution tests will receive a presumptive rating of "Needs to Improve" or "Substantial Noncompliance," depending on the results of their CRA evaluation measures. *Id.* The numeric performance ratings benchmarks applicable to these performance standards are not yet in place; they will be determined in a subsequent rulemaking. FR 34,736, 34,774.

### (iii)    Performance Context

The previous regulations injected multiple levels of qualitative judgment by requiring examiners to consider performance context when applying all the applicable tests and standards. 12 C.F.R. §§ 25.21(b), 195.21(b) (1-1-20 ed.); FR 34,762. The Final Rule appropriately preserves the ability to consider qualitative performance context factors, including: the innovativeness, complexity, and flexibility of qualifying activities; their responsiveness to the needs of the community; demand; demographic factors; competitive environment; and written comments from the public about assessment areas needs and opportunities. 12 C.F.R. § 25.16. Based on performance context, examiners may adjust

a presumptive rating up or down, but only *after* the multiple objective measurements and the resulting presumptive rating have been ascertained. *Id.*

### 4. Greater Transparency from Timely and Meaningful Data Disclosure

Under the previous framework, a bank's performance evaluation ("PE") – the OCC's written evaluation about a bank's record of meeting the credit needs of its entire community – could be in excess of 1,000 pages and take years to finalize, making it a challenge to draw timely comparisons across banks and evaluation periods. FR 34,736, 34,778. The Final Rule improves upon this by enabling the completion of more transparent and timely PEs that provide more objective and meaningful information to stakeholders. *Id.* PEs under the Final Rule will continue to discuss the facts and data supporting their conclusions, as statutorily required under 12 U.S.C. § 2906(b). FR 34,770, 34,783.

Under the Final Rule, CRA disclosure statements (both for individual banks and in the aggregate) will continue to allow "stakeholders to observe trends and monitor and compare banks' CRA activities" for banks evaluated under the general performance standards. FR 34,782. For the first time, aggregate CRA-focused public disclosure statements will include data on home mortgage and consumer loans. 12 C.F.R. § 25.27(b). Plaintiffs concentrate instead on the Final Rule's changes to the public disclosure of individual bank data related to small loans to businesses and farms ("SLBF"). Compl. ¶¶ 147-49, 161. Under the previous regulations, the OCC prepared annual CRA disclosure statements for individual banks that contained the number and amount of SLBF, as defined thereunder, by county (and each assessment area smaller than a county), with amounts and distributions across geographies, and by income level. 12 C.F.R. §§ 25.42(h)-(i), 195.42(h)-(i) (1-1-20 ed.). Individual disclosure statements included the number and amount of SLBF and the geographies where originated. *Id.* Under the Final Rule, individual disclosure statements will provide, by bank, the quantified dollar value of all qualifying retail loans and CD activities. 12 C.F.R. § 25.27(a). Aggregate CRA disclosure statements will provide, by county, the aggregate number of SLBF, with breakouts for SLBF to CRA-eligible businesses and farms, and SLBF in LMI census tracts. 12 C.F.R. § 25.27(b).

III.    PLAINTIFFS' COMPLAINT

Plaintiffs NCRC and CRC filed this action on June 25, 2020. Plaintiffs bring suit on behalf of themselves and their members challenging the OCC's promulgation of the Final Rule pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. § 702. Compl. ¶¶ 1-8. Count One charges that the Final Rule is arbitrary, capricious, and contrary to law. Compl. ¶¶ 162-70. Count Two alleges the OCC promulgated the Final Rule "without observance of procedure required by law." Compl. ¶¶ 171-76. Plaintiffs seek declaratory and injunctive relief, setting aside the Final Rule. Compl., pp. 53-54.

IV.    LEGAL STANDARDS

This case should be dismissed under Rule 12(b)(1) for lack of subject matter jurisdiction because Plaintiffs lack standing. Rule 12(b)(1) dismissal is proper when a plaintiff fails to meet its burden to establish all elements of standing. *See Chandler v. State Farm Mut. Auto. Ins. Co.*, 598 F.3d 1115, 1122 (9th Cir. 2010). To plead proper standing, Plaintiffs must show that they have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo*, 136 S. Ct. at 1547. Injuries must be concrete and particularized; "[c]onjectural, hypothetical, or speculative injuries, such as '[a]llegations of possible future injury,' do not suffice." *Ctr. for Biological Diversity v. Bernhardt,* 946 F.3d 553, 560 (9th Cir. 2019) (citation omitted). These elements must be satisfied "for each claim [a plaintiff] seeks to press and for each form of relief that is sought." *Town of Chester, N.Y. v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1647 (2017) (citation omitted); *see Bernhardt,* 946 F.3d at 560. A plaintiff bears a heightened burden to allege standing when the "asserted injury arises from the government's allegedly unlawful regulation . . . of *someone else* . . .." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 562 (1992). Plaintiffs' claims should also be dismissed because they are unripe. The ripeness inquiry has two components, constitutional and prudential ripeness. *In re Coleman*, 560 F.3d 1000, 1004 (9th Cir. 2009). "The central concern [of the ripeness inquiry] is whether the case involves uncertain or contingent future events that may not occur as anticipated, or indeed may not occur at all." *Chandler*, 598 F.3d at 1122-23 (internal quotations omitted) (citations omitted).

Under Rule 12(b)(6), the Complaint should also be dismissed because Plaintiffs' claims do not

fall within CRA's "zone of interests." The APA provides that a person "adversely affected or aggrieved by agency action *within the meaning of a relevant statute*, is entitled to judicial review thereof." 5 U.S.C. § 702 (emphasis added). This clause requires a plaintiff to "establish that the injury he complains of (*his* aggrievement, or the adverse effect *upon him*) falls within the 'zone of interests' sought to be protected by the statutory provision whose violation forms the legal basis for his complaint." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 883 (1990). A complaint is subject to dismissal when a plaintiff is "not itself the subject of the contested regulatory action . . . [and] plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 399 (1987).

In the alternative, Count One should be dismissed, in part, under Rule 12(b)(6) because Plaintiffs fail to state a claim for relief. To survive a Rule 12(b)(6) motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Dismissal may be based on the lack of a cognizable legal theory or on the absence of sufficient facts alleged under a cognizable legal theory. *Johnson v. Riverside Healthcare Sys. LP*, 534 F.3d 1116, 1121 (9th Cir. 2008); *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001). Conclusory allegations of law and "unwarranted deductions of fact, or unreasonable inferences" are insufficient to defeat a motion to dismiss. *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001).

When considering dismissal pursuant to Rule 12(b)(1) or 12(b)(6), "a court may look beyond the complaint to matters of public record without having to convert the motion into one for summary judgment . . . [and] need not presume the truthfulness of the plaintiffs' allegations." *White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000) (citation omitted); *see also United States v. Corinthian Colls.*, 655 F.3d 984, 999 (9th Cir. 2011) (a court can consider materials that are submitted with and attached to, or referenced, in a complaint).

V.   ARGUMENT

**A.    Plaintiffs Lack Standing to Pursue This Action**

NCRC and CRC both fail to establish standing on either their own behalves (organizational standing) or on behalf of each of their members (associational standing). *See Am. Diabetes Ass'n v. U.S. Dep't of the Army*, 938 F.3d 1147, 1154-57 (9th Cir. 2019). First, Plaintiffs fail to establish organizational standing because they have not, and cannot, allege any cognizable, concrete injury that actually frustrates their organizational missions. Instead, Plaintiffs claim injury from a change in the granularity of information made public by the OCC. This change, however, is not a cognizable informational injury because there is no existing legal requirement for the public disclosure of the SLBF information at issue. *See e.g. Friends of Animals v. Jewell*, 828 F.3d 989, 992 (D.C. Cir. 2016) (rejecting informational injury based on Endangered Species Act provision that did not require any disclosure of information). Plaintiffs claim associational standing based on speculation that their members will suffer harm when banks *potentially* alter their CRA activities in the future. But these speculations are based upon mischaracterization of the Final Rule, *see Bernhardt,* 946 F.3d at 560, and also lack the necessary causative link to confer standing. Further, because the numeric benchmarks and thresholds necessary to implement the Final Rule's general performance standards are not yet finalized, the alleged injuries are especially speculative, *id.*, and the associated claims are unripe. In the absence of injury-in-fact, Plaintiffs lack standing to pursue either their substantive claims of unlawfulness (Count One), or their claim that the OCC failed to abide by the APA's procedural requirements (Count Two). *See id*; *see also California v. Azar*, 911 F.3d 558, 570-71 (9th Cir. 2018).[9]

**1.    Plaintiffs Lack Organizational Standing**

Plaintiffs' assertions of organizational standing fail. An organization may establish standing if it can show that it has (1) suffered an injury due to "diversion of its resources to combat the particular

---

[9] Moreover, Plaintiffs fail to plead how additional notice or other additional procedural steps in the rulemaking could have affected any concrete interest or changed the substantive result (Final Rule). *See Azar*, 911 F.3d at 570-71*; see also Spokeo*, 136 S. Ct. at 1550 ("cannot satisfy the demands of Article III by alleging a bare procedural violation").

[conduct] in question" and (2) experienced "frustration of its organizational mission." *Am. Diabetes Ass'n*, 938 F.3d at 1154 (citation omitted). Plaintiffs fail to demonstrate either element because their allegations of harm are insufficient.

### (i) Plaintiffs Do Not Identify an Actual Diversion of Resources to Prevent an Actual Injury

With respect to the first element, an organization cannot "manufacture the injury by incurring litigation costs or simply choosing to spend money fixing a problem that otherwise would not affect the organization at all." *La Asociacion de Trabajadores de Lake Forest v. City of Lake Forest,* 624 F.3d 1083, 1088 (9th Cir. 2010). In fact, an organization "may sue only if it was forced to choose between suffering an injury and diverting resources to counteract the injury." *Id.* at 1088 n.4. The Ninth Circuit has found organizational standing where plaintiffs have already diverted scarce resources or changed organizational behavior to combat the negative effects of challenged policies. *Nat'l Council of La Raza v. Cegavske*, 800 F.3d 1032, 1040 (9th Cir. 2015) (resources diverted to counter low voter registration numbers resulting from state's inaction); *see Serv. Women's Action Network v. Mattis*, 352 F. Supp. 3d 977, 984-85 (N.D. Cal. 2018) (resources diverted to "fielding phone calls and putting on a workshop to combat the negative effects of [] policies" that were plausibly alleged to be discriminatory). Here, Plaintiffs fail to even generally allege that they have been required to divert resources or change behavior. They merely speculate, without support, as discussed *infra*, that some *future* impact will result in them spending additional resources. Such hypothetical allegations fall well below the requirement to assert "concrete and demonstrable injury to the organization's activities." *Cf. Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982).

Moreover, because Plaintiffs fail to plausibly allege that the Final Rule will result in any injury to anyone, as discussed *infra*, they also fail to show that they "would have suffered *some other injury* if [they] had not diverted resources to counteracting [any] problem." *La Asociacion de Trabajadores de Lake Forest*, 624 F.3d at 1088 (emphasis added). The present case is not comparable to *Havens* where *unlawful* housing discrimination made it more difficult for the plaintiff organization to counsel its clients, necessitating a diversion of resources to combat illegal action. 455 U.S. at 379. Here, as

discussed below, Plaintiffs have failed to identify an injury in fact resulting from the Final Rule that requires them to adapt their organizational efforts. To the extent Plaintiffs adjust their operations in light of the OCC's CRA reform, absent any concrete injury-in-fact, this is not a diversion of resources sufficient to confer standing. *La Asociacion de Trabajadores de Lake Forest*, 624 F.3d at 1088.

        **(ii)**        **Rather than Frustrate Plaintiffs' Missions, the Final Rule Provides New Opportunities for Plaintiffs**

With respect to the second element of organizational standing, Plaintiffs assert that their organizational missions have been frustrated by the Final Rule. Compl. ¶¶ 11-12, 137-44, 146-55, 158, 160-61. These assertions, however, are based on mischaracterization, including the speculation that the Final Rule will incentivize high-dollar activities and result in less activities that meet the needs of LMI communities. As discussed *infra*, Plaintiffs' claims are, at this stage, complete conjecture, and fail to allege a cognizable, concrete injury sufficient to show any actual frustration of their missions.

Rather than frustrate Plaintiffs' missions, the Final Rule provides new opportunities for Plaintiffs to pursue their missions, adding to the implausibility of the alleged injuries. Plaintiffs may now prospectively encourage banks to meet communities' needs by seeking OCC "confirmation that an activity is confirmed to be or determined not to be a qualifying activity." 12 C.F.R. § 25.05; *see supra* Section II.B.1. This new confirmation process will enable Plaintiffs and their members to more effectively advocate for CRA credit for innovative and responsive projects. *See* FR 34,738 (to avoid uncertainty regarding the availability of CRA credit, banks have gravitated to a few types of activities that have received credit in the past), 34,749-50.[10]

Ignoring these new opportunities, Plaintiffs complain about the Final Rule's requirement that examiners consider "written comments about *assessment area needs and opportunities* submitted to the bank or the OCC," 12 C.F.R. § 25.16(b)(4) (emphasis added), when assessing performance context.

---

[10] Recognizing the value of such involvement, Plaintiffs complain that there is no similar opportunity to participate in the CRA desert confirmation process at 12 C.F.R. § 25.06. Compl. ¶ 143. But they fail to articulate how it harms them that the Final Rule seeks to ensure that banks appropriately claim application of multipliers for activities in areas that meet the definition of CRA desert. *See* 12 C.F.R. §§ 25.03, 25.08(b)(3). Plaintiffs' alleged injury from this confirmation process lacks concreteness and is insufficient to confer standing.

Compl. ¶¶ 143, 155. Under the previous regulations, examiners applied multiple subjective performance standards in the context of, *inter alia*, "any written comments about *the bank's CRA performance*." 12 C.F.R. § 25.21(b)(6) (1-1-20 ed.) (emphasis added). But any injury from the description of the scope of public comments is wholly speculative because the role of performance context is different under the two frameworks. *See supra* Section II.B.3.iii. Also, public comments are still considered "prior to the issuance of CRA ratings, [with the result that] the rule does not diminish the impact of public comments on CRA performance ratings." FR 34,775. Further, Plaintiffs' assertion that a possible five-year CRA examination cycle for banks rated Outstanding, Compl. ¶¶ 135, 155, would harm them due to less frequent opportunity to have their input considered, is speculative and, at the end of the day, implausible. Banks potentially eligible for five-year cycles would be the banks best succeeding in meeting the credit needs of their communities. FR 34,783. Moreover, all banks will still be required to report data annually and banks subject to the general performance standards will be subject to annual public disclosures. *Id., see also* 12 C.F.R. Part 25, Subpart E.

### 2. Plaintiffs Lack Associational Standing

Plaintiffs' assertions of associational standing also fail. In order to show associational standing, an organization must show: (1) "its members would otherwise have standing to sue in their own right;" (2) "the interests it seeks to protect are germane to the organization's purposes;" and (3) "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Am. Diabetes Ass'n*, 938 F.3d at 1155 (citations omitted). Plaintiffs must show that "a member suffers an injury-in-fact that is traceable to the defendant and likely to be redressed by a favorable decision." *Associated Gen. Contractors of Am., San Diego Chapter, Inc. v. Cal. Dep't of Transp.*, 713 F.3d 1187, 1194 (9th Cir. 2013).

Plaintiffs fail to meet this burden for at least two reasons. First, Plaintiff CRC fails to even name a *specific* member in the Complaint, or to particularize an injury with respect to any identified member. *Associated Gen. Contractors of Am.*, 713 F.3d at 1194 (a plaintiff must make "specific allegations establishing that at least one *identified member* had suffered or would suffer harm."); *see also Summers v. Earth Island Inst.*, 555 U.S. 488, 498–99 (2009) (dispensing of individual naming requirement only

where all members affected; citing case where all organizational members affected because of release of membership list). Second, Plaintiffs fail to plausibly allege associational standing, or any form of standing, because they fail to credibly allege any concrete injury to themselves or any of their members that is fairly traceable to the Final Rule and redressable. Each of Plaintiffs' failures with respect to meeting these burdens is addressed in turn.

### 3. Plaintiffs Fail to Identify a Cognizable Informational Injury with Regard to the Final Rule's Data Disclosure Provisions

Plaintiffs allege informational injuries to assert standing to challenge the Final Rule's public data disclosure provisions. Compl. ¶¶ 140, 143, 146-49, 150-52, 155, 160-61. They focus on changes to the granularity of data in annual aggregate and individual CRA public disclosure statements related to small loans to businesses and farms, or "SLBF," data (specifically, SLBF data for individual banks). *Id.*; *see supra* Section II.B.4. But because Plaintiffs have no statutory guarantee of the disclosure of this data in any particular form, and there is no existing legal requirement for such disclosure, they fail to allege a cognizable informational injury.

The Ninth Circuit recognizes that "[a] plaintiff sustains a cognizable informational injury in fact when agency action cuts her off from 'information which must be publicly disclosed pursuant to a statute.'" *Animal Legal Defense Fund v. U.S. Dep't of Agric.* ("*ALDF*"), 935 F.3d 858, 867 (9th Cir. 2019); *see also Wilderness Soc'y Inc. v. Rey*, 622 F.3d 1251, 1258 (9th Cir. 2010) (discussing *FEC v. Akins*, 524 U.S. 11 (1998)). But courts reject informational injury claims when a plaintiff is, as here, "seeking to enforce a statutory . . . provision that by its terms does not require the public disclosure of information." *Friends of Animals v. Jewell*, 828 F.3d at 992. CRA contains no public disclosure statement provisions. To the extent CRA seeks to promote public transparency, it is through the public section of performance evaluations ("PEs") in which a bank's ratings and the OCC's conclusions and supporting data must be disclosed. 12 U.S.C. § 2906(b). The Final Rule continues to require PEs to contain the facts and data supporting CRA examination conclusions and ratings. FR 34,781; 12 U.S.C. § 2906(b). Beyond this statutory requirement, the previous regulations and the Final Rule provide for individual bank and aggregated public disclosure statements. *See supra* Section II.B.4. The

Final Rule does not eliminate Plaintiffs' access to information in disclosure statements; rather, it simply modifies the information released in disclosure statements to better conform to the revised evaluation criteria. FR 34,782-83.

Here, as in *Friends of Animals*, the statute at issue – CRA – confers no statutory right to the specific information Plaintiffs desire. "Congress has the power to define injuries" under CRA, but did not define any informational requirements Plaintiffs assert. *See Lujan*, 504 U.S. at 580. Rather, in the absence of any statutory requirement, Plaintiffs allege injury from a claimed change in, not *elimination of*, public information pursuant to regulatory provisions, first promulgated, in different form, in 1993, and revised in 1995. Compl. ¶ 136; 58 Fed. Reg. 67,466, 67,473 (Dec. 21, 1993); 60 Fed. Reg. 22,156, 22,174 (May 4, 1995). And while a court in this district has found informational injury based on regulatory, rather than statutory, right to information, *see, e.g.*, *Nat'l Educ. Ass'n v. DeVos*, 345 F. Supp. 3d 1127, 1146 (N.D. Cal. 2018), the same case does not suggest that standing is conferred based on a disclosure requirement in a superseded regulation. *Cf. id.* (discussing line of information injury cases that find standing stemming from denial of information conferred under regulatory provisions). Here, CRA does not require the disclosure of the SLBF data Plaintiffs seek, nor is there a currently existing overarching "government-wide regulation" that entitles them to this data. *Id.* All they rely on for the alleged injury is the OCC's prior regulation, which has been superseded and revised to reflect the updated Final Rule. Without clear congressional intent to require the precise disclosure at issue through statutory enactment, an informational injury arising from a revision of a now superseded regulation, is simply insufficient to confer standing. This is particularly true, when in this case, unlike *DeVos*, 345 F. Supp. 1127, the OCC is not *denying* or *withholding* Plaintiffs' access to information in total; only modifying the granularity of it.

Moreover, contrary to Plaintiffs' allegations, the Final Rule actually increases transparency: public disclosure statements will now include aggregate SLBF data on more loans as a result of revised definitions under the Final Rule and aggregate data on home mortgage and consumer loans. FR 34,734. And the evaluation process for individual banks subject to the general performance standards will result in more timely and transparent data in public PEs. FR 34,736 ("[E]xaminers will be able to produce

more consistent, useful, and timely CRA PEs that will enable banks, regulators, and others to have a better understanding of the CRA activities of individual banks and of cross-sections of the industry.").

### 4. Plaintiffs' Alleged Injury from Reduced CRA Activities Benefitting LMI Communities Is Not Traceable to the OCC and Is Speculative

Plaintiffs speculate that the Final Rule will impair their "ability . . . to obtain meaningful investments in the LMI communities they serve," and that their programs will suffer as a result of the "diversion of lending from small-dollar to large-dollar loans, and away from . . . LMI communities." Compl. ¶¶ 141, 144.; *see also id.* ¶¶ 145, 150, 156-59. They further allege that the Final Rule will "impair [their] negotiations of agreements to increase CRA investment in LMI communities" and force them to compete with "large-scale" projects. *Id.* ¶¶ 137, 153. Plaintiffs fail to plead adequate standing to pursue these challenges to the Final Rule. *Even if* any hypothetical injury could occur in the future, it would not be fairly traceable to the Final Rule. Moreover, Plaintiffs mischaracterize the rule and its incentives; the Final Rule is, in fact, structured to avoid the very harms speculatively alleged.

Plaintiffs' Complaint identifies no instance of a decrease in or loss of CRA eligible loans or investments as a result of the Final Rule. But *even if* Plaintiffs could plausibly establish concrete injury-in-fact from changes in the CRA activities banks will engage in, they could not establish that those injuries would be fairly traceable to the Final Rule. Rather, changes in banks' CRA activities would be the result of independent business decisions of banks. Traceability demands that Plaintiffs "adduce facts showing" that their asserted injury was caused by the Final Rule and not the result of the "independent action of some third party not before the court;" this can be "'substantially more difficult' to establish" when Plaintiffs themselves are not the subject of the challenged rule. *Lujan*, 504 U.S. at 560-62 (citations omitted). As described more below, the Final Rule actually incents the CRA activity Plaintiffs desire. *See also supra* Section II.B. Plaintiffs' speculations, therefore, are *dependent* on the exercise of business discretion by banks to *choose* higher-dollar activities, to the exclusion of the types of community needs that they currently address, which "courts cannot presume either to control or to predict." *Lujan*, 504 U.S. at 562 (internal quotations omitted).[11] In fact, the Complaint belies any

---

[11] It is also speculative and, in the end, implausible that a bank would pursue a business strategy that

assertion of traceability where it speculates as to the injurious choices of *banks* reducing "meaningful investments" multiple times in just one paragraph. Compl. ¶ 141.

In addition to lacking traceability, Plaintiffs' belief that the Final Rule will, *at some point in the future*, decrease the availability of CRA lending and investment benefitting their members or LMI communities is too speculative to establish standing. *See Bernhardt,* 946 F.3d at 560. As a threshold matter, Plaintiffs fail to plead with specificity how exactly the Final Rule would actually result in *less* CRA activity addressing LMI communities' needs; why the Final Rule's enhancements and clarifications are outside the scope of their organizational missions; and why it harms Plaintiffs and their members if banks receive CRA credit for the first time for activities such as, for example, CD lending, investments, and services in metropolitan distressed areas. *See* 12 C.F.R. § 25.04(c)(4)-(6), (8); *see also id.* § 25.03 (defining *distressed area* as middle-income census tract experiencing high unemployment, poverty, or population loss); *cf.* 12 C.F.R. §§ 25.12(g)(4)(iii), 195.12(g)(4)(iii) (1-1-20 ed.) (previous regulations identifying distressed *nonmetropolitan* middle-income geographies as communities where banks can receive credit for revitalizing or stabilizing activities).

First, the Final Rule enhances incentives for CRA activities that are responsive to LMI communities*,* including smaller dollar activities. *See supra* Section II.B. For example, Plaintiffs assertion that banks will reduce investment in Low Income Housing Tax Credits ("LIHTCs"), Compl. ¶ 159, lacks plausibility when one considers that the Final Rule directly incentivizes investment in affordable housing projects, as well as the sponsorship of LIHTCs. FR 34,770 n.139; 34,754 (discussing the role that LIHTCs play in affordable housing supply). Plaintiffs also focus on banks' ability to obtain CRA credit for infrastructure projects under the Final Rule, but some infrastructure projects already qualify for CRA credit under the previous regulations,[12] undermining their claim of harm. *See* FR

_____

focuses on higher dollar activities and neglects retail lending to LMI populations and census tracts, because it would actually cause a bank to risk (i) failing its retail lending distribution tests, and (ii) a downward adjustment from the presumptive rating based on performance context. FR 34,744-45, 34,765, 34,776.

[12] *See Interagency Q&As Regarding Community Reinvestment; Guidance*, 81 Fed. Reg. 48,506, 48,511 (July 25, 2016), *available at* https://www.ffiec.gov/cra/qnadoc.htm.

DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS PLAINTIFFS' COMPLAINT
CASE NO. 20-cv-04186-SK

34,770 n.141 (underscoring the criticality of infrastructure projects for underserved communities). Further, the financing of essential infrastructure and community facilities projects that only *partially* serve LMI individuals or families or LMI or other communities of need (*i.e.*, bridges, hospitals, schools, *etc.*) will only receive credit for the portion of those projects that *actually benefit* groups or geographies of need. 12 C.F.R. §§ 25.03, 25.04(c)(5)-(6).

Plaintiffs continue with their erroneous reading of the Final Rule by making the counter-factual assertion that a "single ratio" approach will make CRA examinations easier to pass because banks can ignore LMI community needs, including smaller dollar activities. Compl. ¶¶ 49, 58, 109, 117, 118, 141, 158. This is nothing more than baseless conjecture. *Bernhardt,* 946 F.3d at 560.[13] To start, Plaintiffs are simply incorrect – the general performance standards involve more than a *single ratio*. The general performance standards in the Final Rule include (i) retail lending distribution tests; (ii) the CRA evaluation measure, including quantification of branches serving LMI and other areas of need; (iii) CD minimum; and (iv) application of performance context to examine, *inter alia*, responsiveness to community needs. *See supra* Section II.B.3. These multiple measures, applied at the bank level and each assessment area, "ensure that the framework continues to incentivize important (and at times smaller dollar value) activities." FR 34,763. Also, the availability of multipliers incents CD investments and certain CD loans, services, and retail loans, as well as all other affordable housing-related CD loans. 12 C.F.R. § 25.08(b); FR 34,755.

Without more than a "*mere possibility*" that the Final Rule will have the unintended consequence of decreased LMI activity, Plaintiffs fail to advance their "claim of injury 'across the line from conceivable to plausible.'" *Bernhardt,* 946 F.3d. at 560 (citing *Twombly*, 550 U.S. at 570) (emphasis added); *see also Nuclear Info. & Res. Serv. v. Nuclear Regulatory Comm'n*, 457 F.3d 941, 954-55 (9th

---

[13] The allegation that financial institutions will engage in "charter shopping," Compl. ¶ 146, by seeking to convert to OCC supervision for CRA-compliance purposes is also pure conjecture. As Plaintiffs concede, the burden of CRA compliance is "comparatively light" relative to other obligations, Compl. ¶ 37, that might logically be among the multiple factors that drive the complex business decision of what charter to pursue. *See, e.g.,* Gregory J. Hudson and Kory Killgo, *Community Banks are Flipping Over a State Charter*, Dallas Fed Financial Insights, First Quarter 2017, 1-4, *available at* https://www.dallasfed.org/~/media/documents/outreach/fi/2017/fi1701.pdf.

Cir. 2006) (Plaintiffs lacked standing in part because there was no reasonable probability of harm since challenged final rule appears to serve, rather than harm plaintiff).

5.     **Plaintiffs' Alleged Injuries Are Speculative and Unripe Because Performance Benchmarks and Thresholds Have Not Yet Been Finalized**

Plaintiffs' claims should also be dismissed because they are unripe under both constitutional and prudential inquiries. Constitutional ripeness coincides with standing's injury-in-fact prong, characterized as "standing on a timeline," and depends on "whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality. . .." *In re Coleman*, 560 F.3d at 1005; *Thomas v. Anchorage Equal Rights Comm'n*, 220 F.3d 1134, 1138 (9th Cir. 2000). The prudential ripeness test is comprised of two elements: "fitness of the issues for judicial decision" and "hardship to the parties of withholding court consideration." *Principal Life Ins. Co. v. Robinson*, 394 F.3d 665, 670 (9th Cir. 2005). Even if jurisdiction is "technically present," premature and abstract claims are properly dismissed if they lack prudential ripeness. *In re Coleman*, 560 F.3d at 1006.

Plaintiffs' allegations fail to meet both prudential or constitutional ripeness requirements. First, Plaintiffs' alleged injuries based on assertions that banks will perform fewer or less valuable CRA activities, *e.g.*, Compl. ¶¶ 141, 144-45, 158, are speculative because the OCC has not finalized the numeric performance thresholds and benchmarks under the Final Rule's general performance standards. *See supra* Section II.B.3.i-ii. Plaintiffs acknowledge that finalization of these thresholds and benchmarks is necessary to fully implement and understand the impact of the Final Rule. Compl. ¶¶ 116, 123, 124, 125. Given this current inchoate state, Plaintiffs lack standing, and their claims are not ripe to challenge the Final Rule based on its ultimate impact on the level and types of banks' CRA activities. *See Bernhardt*, 946 F.3d at 560. Although the OCC proposed in the JNPR reasonable benchmarks and thresholds for the retail lending distribution tests, CRA evaluation measure, and CD minimum based on available historic data, data limits left some uncertainty. FR 34,774. The OCC decided "it would be appropriate to gather more information and further calibrate the benchmarks, thresholds, and minimums," *id.*, through a subsequent rulemaking to implement the Final Rule's framework of

"incentiviz[ing] banks to achieve specific performance goals." FR 34,734. Therefore, Plaintiffs'

speculation about how the Final Rule will allow banks to pass their CRA examinations while doing less

valuable CRA qualifying activity is simple conjecture insufficient to confer Article III jurisdiction. *See*

*Bernhardt,* 946 F.3d at 560.[14]

Second, prudential considerations argue against adjudication of Plaintiffs' "abstract

disagreements over administrative policies" and the OCC should be shielded "from judicial interference

until [outstanding] administrative decision[s] ha[ve] been formalized and *[their] effects felt in a concrete*

*way by the challenging parties*." *Principal Life Ins. Co.*, 394 F.3d at 670 (emphasis added) (citations

omitted). Because the benchmarks and thresholds for the general performance standards have not yet

been set, Plaintiffs' case and request for relief—premised on claims that banks' CRA activities will be

insufficient under the Final Rule—are speculative and not appropriate at this time for judicial decision.

*In re Coleman*, 560 F.3d at 1009 (purpose of fitness test is to "delay consideration of the issue until the

pertinent facts have been well-developed in cases where further factual development would aid the

court's consideration"). Further, any hardship asserted by Plaintiffs is premised on banks' compliance

with the Final Rule. *E.g.,* Compl. ¶¶ 137, 150. As such, there is no current hardship to Plaintiffs if the

Court withholds judicial consideration because no banks are required to comply with the general

performance standards until 2023, and they cannot comply until benchmarks and thresholds are set. FR

34,784; *Colwell v. Dep't of Health & Human Servs.*, 558 F.3d 1112, 1124 (9th Cir. 2009) (regulation not

ordinarily the "type of agency action 'ripe' for judicial review under the APA" until "scope of the

controversy has been reduced to more manageable proportions, and its factual components fleshed out,

by some concrete action applying the regulation to the claimant's situation in a fashion that harms or

threatens to harm him.") (citation omitted).

---

[14] The OCC has also not yet issued guidance to implement certain aspects of the Final Rule. *See, e.g.,* FR 34,736, 34,751 (application of performance context); 34,737 n.16, 34,761-62, 34,776 & n.165 (general compliance); 34,740, 34,743 34,749 (implementation of qualifying activities provisions including documentation required); 34,780-81 (data collection, maintenance, and reporting).

## B.    Plaintiffs' Claims Are Not Within the Zone of Interests Protected by CRA

Plaintiffs' Complaint should be dismissed under Rule 12(b)(6) because Plaintiffs' claims and allegations of potential harm stemming from the OCC's implementation of the CRA fall outside of CRA's zone of interests. *See Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 128 & n.4 (2014) (discussing "statutory standing;" plaintiff must have "a cause of action under the statute"); *Lujan*, 497 U.S. at 883. The zone-of-interests test "denies a right of review if the plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." *Clarke*, 479 U.S. at 399. Plaintiffs cannot carry this burden in either respect: their relationship with CRA is too indirect and their interests, as stated in part, are inconsistent with the clear purpose of CRA.

### 1.    Plaintiffs' Interests Are Insufficiently Related to CRA

Plaintiffs are neither directly regulated nor directly benefited by CRA. LMI individuals, small businesses, farms, and members of communities of need are, for example, the beneficiaries of banks' CRA activities and the individuals directly in the statute's zone of interests—not Plaintiffs. CRA is "clearly intended to encourage federally regulated financial institutions to 'help meet the credit needs of the local communities in which they are chartered.'" *See Exch. Bank v. Dir. of the Office of Thrift Supervision*, 29 F. Supp. 2d 1272, 1276 (N.D. Okla. 1998) (citing 12 U.S.C. § 2901). It "[does] not [contain] a directive to undertake any particular program or to provide credit to any particular individual." *Lee v. Bd. of Governors of the Fed. Reserve Sys.*, 118 F.3d 905, 913 (2d Cir. 1997). Furthermore, nowhere in the statute does Congress provide advocacy organizations, such as Plaintiffs, a role in supporting the purpose of CRA. These facts are fatal to Plaintiffs' claims. *See East Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 768-69 (9th Cir. 2018) (finding that legal aid organizations were "at the least, arguably within the zone of interests protected by the INA" where the INA had expressly given legal aid organizations "a role in helping immigrants navigate the immigration process") (internal quotations omitted); *City & County of San Francisco v. U.S. Citizenship & Immigration Servs.*, 408 F. Supp. 3d 1057, 1117-18 (N.D. Cal. 2019) (finding that plaintiff organizations had not met their burden under the zone-of-interests test because, among other reasons, the statute cited did not "give

institutions like the [plaintiffs] a role[.]") (citing *East Bay*, 932 F.3d at 769), *appeal dismissed sub nom.*
*La Clinica de La Raza, Inc. v. Trump*, No. 19-17483, 2020 WL 1170719 (9th Cir. Feb. 4, 2020).

Plaintiffs cannot cure these deficiencies and bring their claims within the zone of interests of CRA simply by alleging that they will experience administrative and operational burdens associated with "adjusting their CRA programs." Compl. ¶ 165; *see also Air Courier Conference of Am. v. Am. Postal Workers Union AFL-CIO*, 498 U.S. 517, 524 (1991) ("injury in fact does not necessarily mean one is within the zone of interests to be protected by a given statute"). Indeed, none of the various harms alleged by Plaintiffs are within CRA's zone of interests. *See Lee,* 118 F.3d at 913 ("[A]ny attempt to glean substance from the CRA is met with the reality that the statute sets no standards for the evaluation of a bank's contribution to the needs of its community.").[15] For these reasons, Plaintiffs cannot carry their burden of demonstrating that their interests are sufficiently related to CRA.

### 2. Plaintiffs' Interest in Uniformity Across Agencies' Regulations Conflicts with the Statute's Flexibility

Plaintiffs also take issue with the OCC's decision to promulgate regulations to implement the CRA that will differ from other agencies' CRA regulations. But their asserted interest in maintaining regulatory uniformity, Compl. ¶¶ 146, 160, 165, belies both congressional intent and historic practices. Plaintiffs allege that "[u]ntil the present rulemaking, [the OCC, FDIC, and Board of Governors of the Federal Reserve System ("Fed")] have worked in unison . . . to establish a single framework." Compl. ¶ 26. This challenge to OCC's statutorily-authorized—and by no means unprecedented—decision to act independently to modernize its CRA regulations is inconsistent with the purposes implicit in the statute's flexibility that allows the OCC, and the other agencies, to promulgate rules alone.

There is no statutory requirement that the banking agencies promulgate rules jointly. Rather, CRA provides that *each appropriate* banking agency shall publish regulations for the institutions for which it has rule-writing responsibilities. 12 U.S.C. § 2905. Moreover, Plaintiffs erroneously allege that the banking agencies have historically proceeded in "lockstep" on CRA. Compl. ¶ 165. On the contrary,

---

[15] In particular, Plaintiffs' alleged informational injury is not within CRA's zone of interests for the reasons stated *supra*, Section V.A.3.

as recounted in the "supplementary information" section of the former Office of Thrift Supervision ("OTS")[16] 2007 amendments to its CRA regulations, the agencies have vacillated into and out of regulatory uniformity, taking various approaches to implementing CRA from 2004 to 2007. *See* 72 Fed. Reg. 13,429-01 (Mar. 22, 2007).

Due to the need for CRA modernization to better meet the statute's purpose, Plaintiffs cannot validly challenge the OCC's decision to act independently; their stated interest is inconsistent with enabling reform and advancing the purposes of CRA. *Cf. Exch. Bank*, 29 F. Supp. 2d at 1276 (finding that plaintiff did not satisfy zone-of-interests test where interest in bringing lawsuit was to limit banking competition and was thus inconsistent with purposes of CRA). As commenters opposed to OTS's March 2007 amendments put it, "Uniformity is not necessary to ensure that savings associations meet the credit needs of their communities." *See* 72 Fed. Reg. 13,429-01. Allowing Plaintiffs' challenge to the OCC's decision to act independently to modernize its regulations—a decision that is neither statutorily unauthorized nor unprecedented—would only frustrate CRA's statutory purpose by erecting a regulatory logjam where Congress has clearly sought to confer on banking agencies the independent authority to innovate and pioneer. *See Clarke*, 479 U.S. at 397 n.12 (stating that zone-of-interests test "seeks to exclude those plaintiffs whose suits are more likely to frustrate than to further statutory objectives.").

C.      **In the Alternative, the Complaint Is Subject to Dismissal, in Part, for Failure to State a Claim of Unlawfulness Under the APA**

Alternatively, Count One should be dismissed, in part, under Rule 12(b)(6) for failure to state a claim under the APA. Plaintiffs' claims (Compl. ¶¶ 166, 169) that the OCC acted "otherwise not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations," *see* 5 U.S.C. § 706(2)(A), (C), are legally insufficient due to the lack of a "cognizable legal theory" and the failure to allege plausible facts. *See Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990). Claims of prejudgment based on the allegation that former Comptroller Joseph Otting's pre-rulemaking views

---

[16] The 2010 Dodd-Frank Wall Street Reform and Consumer Protection Act abolished OTS and transferred the functions and authority of OTS to OCC, FDIC, and the Fed. 12 U.S.C. §§ 5411-5413.

regarding CRA demonstrated unlawful bias and a failure to consider comments in the rulemaking, Compl. ¶ 168, are also subject to dismissal under Rule 12(b)(6) as a matter of law. *Id.*

### 1. No Aspect of the Final Rule Is in Excess of Statutory Authority or Limitations

Plaintiffs assert the OCC has acted *ultra vires* by promulgating the Final Rule to (1) use ratios in evaluating performance; (2) assign ratings based on performance in a portion of assessment areas; and (3) make optional the delineation of facility-based assessment areas around deposit-taking ATMs. Compl. ¶ 166. Yet, these claims fail to state a claim of unlawfulness because CRA contains no such requirements or limitations. 12 U.S.C. § 2905 requires that "[r]egulations to carry out the purposes of this chapter shall be published by each appropriate Federal financial supervisory agency . . .." 12 U.S.C. § 2906 requires that "written evaluation[s]" state "facts and data" supporting an agency's "conclusions for each assessment factor identified in [its] regulations" and the basis for ratings. CRA leaves other relevant implementing details to agency discretion. *See Lee*, 118 F.3d at 913 (citing legislative history); *see also Powell v. Am. Gen. Fin., Inc.*, 310 F. Supp. 2d 481, 485 (N.D.N.Y. 2004) (CRA has "no sharply delineated standards"); *Corning Sav. & Loan Ass'n v. FHLBB*, 571 F. Supp. 396, 403 (E.D. Ark. 1983) ("CRA merely requires that [an agency] assess an institution's community credit record and consider that record when evaluating branch applications"). Plaintiffs fail to state a claim that the Final Rule is contrary to statute because, as detailed below, they invent nonexistent statutory requirements and limitations. *See, e.g.*, *Ctr. for Envtl. Health v. Perdue*, No. 18-CV-1763-RS, 2018 WL 9662437, at *6 (N.D. Cal. Aug. 21, 2018) ("Plaintiffs can point to nothing in either the text or legislative history . . . that even suggests congressional intent to bar cost-benefit analysis in connection with the promulgation or withdrawal of any particular rule . . .. For that reason, defendants' motion to dismiss this claim is granted, without leave to amend.") (citing *People for the Ethical Treatment of Animals, Inc. v. USDA*, 7 F. Supp. 3d 1, 14 (D.D.C. 2013) (citing *Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 64-65 (2004))). Plaintiffs' claims, premised on baseless legal inferences, are subject to dismissal without leave to amend. *Id.*

### (i)    Plaintiffs Baselessly Infer a Prohibition on Using Ratios

Plaintiffs can point to no support for their assertion that CRA prohibits regulators from using ratios or other empirical tools in evaluating CRA performance. Compl. ¶ 166; *see, e.g.*, *Ctr. for Envtl. Health*, 2018 WL 9662437, at *6. Neither § 2905 nor § 2906 contain such a prohibition. In light of the discretion vested in the agencies by Congress, ratios have long been part of an examiner's comprehensive, multifaceted approach to assessing performance.[17] *See generally S. Utah Wilderness Alliance*, 542 U.S. at 67 ("The prospect of pervasive oversight by federal courts over the manner and pace of agency compliance with [broad] congressional directives is not contemplated by the APA."); *see also SurvJustice, Inc. v. DeVos*, No. 18-CV-535-JSC, 2018 WL 4770741, at *12 (N.D. Cal. Oct. 1, 2018) ("In the absence of plausible allegations that Defendants acted outside their legal authority in issuing the 2017 Guidance, the Court grants Defendants [*sic*] motion to dismiss the claim for *ultra vires* action.") (dismissal amended on separate grounds on reconsideration, 2019 WL 1434144 (N.D. Cal. Mar. 29, 2019)). Moreover, the preamble to the Final Rule addressed Plaintiffs' assertion that legislative history indicates Congress's intent to prohibit a ratio-based framework. *See* FR 34,768; Compl. ¶ 166. Criticisms of the original CRA bill as proposed did not take issue with *regulators* using ratios as part of assessing *past* performance. FR 34,768. Rather, witnesses criticized proposed *statutory text* requiring banks to predict what *future* proportion of deposits would be reinvested in a community. *Id.* Critics of CRA's central premise, that banks should be encouraged to reinvest some proportion of their deposits in their communities (*i.e.* a ratio of CRA activity to deposits), decried the proposed legislation as "credit allocation."[18] *Id.*

---

[17] *See, e.g.,* 12 C.F.R. § 25.26(b)(1) (1-1-20 ed.) ("[a] small bank's lending performance is evaluated pursuant to the following criteria[, including, t]he bank's *loan-to-deposit ratio* . . . ") (emphasis added); *see also supra* Section II.B.3.i-ii (citing previous regulations and guidance for assessing retail lending distribution and impact of CRA activities).

[18] Ironically, by citing this history, *see* Compl. ¶ 119 (citing NCRC Comment at 13-14, Compl. Ex. B), Plaintiffs resurrect the arguments of those who unsuccessfully sought to stop the passage of CRA. *See* 123 Cong. Rec. Sen. 17,625, 17,628, 17,633, 17,636-37 (Jun. 6, 1977) (multiple senators stating, in support of amendment to strike CRA from housing bill, that primary concern was "credit allocation").

DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS PLAINTIFFS' COMPLAINT
CASE NO. 20-cv-04186-SK

**(ii)     The Final Rule's Approach for Assigning Ratings Is Consistent with Statute**

Under the Final Rule, banks will continue to be assessed on their record in every assessment area, 12 C.F.R. § 25.13(d), as well as on CRA activity bank-wide, 12 C.F.R. § 25.13(c). The bank-level presumptive rating, however, is based, in part, on the ratings in a certain portion of a bank's assessment areas and those assessment areas from where it receives a certain portion of its deposits. FR 34,772; 12 C.F.R. § 25.13(c)(1)-(2).[19] Plaintiffs incorrectly assert that this approach is unlawful, ¶ Compl. 166, claiming CRA disallows assigning ratings based on percentages of deposits by misinterpreting unrelated legislative history. Compl. ¶ 122 n.36. In support of this mischaracterization, the Complaint cites pages from the record of March 1977 Senate hearings, *id.*, containing the CRA bill as introduced, which would have required a bank to designate a "primary savings service area" that would be a "compact area contiguous to a deposit facility from which [it] obtains or expects to obtain more than one-half of its deposits." Plaintiffs observe that this text does not appear in the statute as passed. *Id.*  However, nothing in the legislative history—involving how CRA would *identify banks' communities*—supports Plaintiffs' contention that the Final Rule's approach to a different aspect of CRA implementation—*assigning ratings*—is prohibited.

As an initial matter, there is no suggestion that Congress disavowed consideration of percentages of deposits as a way to rationalize identification of a bank's community. The three days of hearings Plaintiffs cite reflect different concerns, including that the bill's definition of service area, as initially introduced, was insufficiently precise; that a service area should include 80% of a bank's deposits; and that the rigidity of the definition did not align with boundaries of communities. Hearings Before the S. Comm. on Banking, Housing, and Urban Affairs, U.S. Senate 95-1 (Mar. 23-25, 1977) at 6-7, 16, 135, 246-48, 301-02, 334. Congress's deliberate omission of statutory standards for service areas has allowed

---

[19] Under the Final Rule, for a bank with more than five assessment areas, the bank must receive a rating of Satisfactory or Outstanding in 80% of its assessment areas (and in the assessment areas from which it receives 80% of its deposits) to receive the same overall presumptive rating. 12 C.F.R § 25.13(c)(1)-(2). For a bank with five or fewer assessment areas, the bank must receive a presumptive rating of Satisfactory or Outstanding in 50% of its assessment areas (and in the assessment areas from which it receives 80% of its deposits) to receive the same overall presumptive rating. *Id.*

DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS PLAINTIFFS' COMPLAINT
CASE NO. 20-cv-04186-SK

the Federal financial supervisory agencies the discretion to develop more appropriate regulatory standards to identify a bank's community through the regulatory construct of assessment areas. *See id.* at 13, 299 (suggesting service areas should be defined by regulation). More to the point, neither CRA, nor the OCC's previous regulations and guidance, require a bank to be Outstanding or Satisfactory in all of its assessment areas to receive the same rating overall.[20]

### (iii) The Final Rule's Treatment of Deposit-Taking ATMs Satisfies Statutory Requirements

Finally, Plaintiffs wrongly assert that the Final Rule is contrary to CRA because it makes the delineation of a facility-based assessment areas around a deposit-taking ATM optional. Compl. ¶ 166; FR 34,756; 34,789; 12 C.F.R. § 25.09(b)(2). This fails to state a claim of unlawfulness. As noted, assessment areas are a regulatory, not a statutory construct and there is no statutory requirement for any specific assessment area delineation. *See supra* Section V.C.1.ii. Regardless of whether an assessment area is delineated, the OCC will continue to evaluate "each metropolitan area" in which a bank maintains any "facility . . . that accepts deposits," including those with only deposit-taking ATMs, as required under 12 U.S.C. § 2906. The data collection and recordkeeping requirements of the Final Rule will provide examiners with enough facts and data upon which to draw these conclusions. FR 34,756, n.85.[21] Based on the discretion that CRA leaves to the agencies, there is no cognizable legal theory that the Final Rule is *ultra vires* in any aspect, and Plaintiffs fail to state a claim in this regard. *See*, *e.g.*, *Ctr. for Envtl. Health*, 2018 WL 9662437, at *6).

### 2. Plaintiffs Fail to State a Claim of Frustration of Statutory Purpose Concerning Redlining, LMI Communities, and Communities of Color

Among the most perplexing of Plaintiffs' claims is that the Final Rule unlawfully

---

[20] *See*, *e.g.,* CRA Large Bank Exam Procedures, pp. 14-18. For this reason, Plaintiffs can claim no injury-in-fact sufficient to confer standing to challenge this aspect of the Final Rule related to determining a bank's bank-level presumptive rating, in part, on the ratings in a certain portion of the bank's assessment areas and those assessment areas from where it receives a certain portion of its deposits. *See supra* Section IV.

[21] Plaintiffs allege no injury resulting from this optionality in delineating assessment areas adequate to confer standing to challenge this aspect of the Final Rule. *See supra* Section IV.

"sweeps aside the longstanding understanding" that CRA has the purpose of preventing redlining and focusing on LMI communities. Compl. ¶ 169. On the contrary, the Final Rule will *better* address redlining and disinvestment by taking a broader approach to identifying banks' communities through the requirement to delineate and evaluate performance in deposit-based assessment areas and enhancing focus on LMI communities. Although the statutory text does not explicitly focus on communities of color, the Final Rule addresses their unmet needs through, *inter alia*, expansion of qualifying activities for additional areas of need and the consideration of discriminatory practices when assigning ratings. As explained further below, Plaintiffs' claim of frustration of statutory purpose is subject to dismissal under Rule 12(b)(6) because it has no plausible basis in fact or law. *See Balistreri*, 901 F.2d at 699.

First, the Final Rule expands where CRA activity is counted, to include geographies from where a bank receives 5% or more of it retail domestic deposits, for banks that have 50% or more of their deposits from areas outside of their facility-based assessment areas. 12 C.F.R. § 25.09(c); *see supra* Section II.B.2.[22] The delineation of deposit-based assessment areas requires banks to demonstrate that they meet the credit needs of more communities where they collect deposits, including the needs of LMI communities, advancing the statutory purpose of reducing redlining and disinvestment. FR 34,756. The legislative history supports the view that CRA aims to discourage banks from taking deposits from a community and investing them elsewhere, to the detriment of local needs. FR 34,768 n.134 (quoting Senator Proxmire); *see also* Compl. ¶ 18 (same).

Second, the OCC designed the Final Rule to avoid "reward[ing] large investments or allow[ing] banks to do far less for LMI communities," contrary to Plaintiffs' allegations. Compl. ¶ 166. The OCC incorporates here its discussion of how the Final Rule will better encourage banks to engage in CRA activities, activities benefitting LMI communities, and activities responsive to community needs, including smaller dollar activities and community development. *See supra* pp. 19-20. Plaintiffs fail to

---

[22] Plaintiffs allege no injury resulting from the requirement for deposit-based assessment areas, and as a result, lack standing to challenge this aspect of the Final Rule. *See supra* Section IV.

state a claim for relief through their "unwarranted deductions of fact" and "unreasonable inferences," contradicted by the requirements of the Final Rule. *See Sprewell*, 266 F.3d at 988.

Finally, to the extent that Plaintiffs describe a broader anti-discrimination objective associated with CRA through its interrelation with the fair lending laws, the OCC agrees. The Final Rule reflects this by, for example, considering evidence of discriminatory or other illegal credit practices as negative information that can result in a downward adjustment of ratings. FR 34,776-77; 12 C.F.R. § 25.17. Furthermore, the unmet needs of communities of color often coincide with needs addressed by qualifying activities directed at LMI and other communities of need. FR 34,748. Specifically, the Final Rule expands the availability of CRA credit for banks' community development activities that meet the needs of metropolitan distressed areas, middle-income areas that experience high rates of poverty, unemployment, or population loss, areas that often correlate with high populations of racial minorities. *Id.*; 12 C.F.R. §§ 25.03, 25.04(c)(4)-(6), (8). The Final Rule requires that certain qualifying activities partially or primarily benefit or serve targeted areas of need, including LMI census tracts, *id.*, evaluates responsiveness to local needs under performance context, *id.* § 25.16(b)(1)(v), (4), and offers multipliers for particularly responsive activities, *id.* § 25.08(b)(4), to prevent negative consequences, such as displacement. FR 34,776.

To the extent the Complaint alleges that CRA requires more with respect to addressing discrimination, Plaintiffs ignore the differences in how CRA and the fair lending laws promote access to credit. Although fair lending laws also combat redlining, FR 34,734 n.3, the analysis is different. Under CRA, banks are encouraged to meet the credit needs of their entire communities, including LMI areas, to combat *disinvestment*. *See Hicks v. Resolution Trust Corp.*, 970 F.2d 378, 382 (7th Cir. 1992) ("There is no language which suggests that [CRA] was intended to prevent racially discriminatory lending policies or minority 'redlining' . . . ."). The fair lending laws, in contrast, prohibit redlining in the form of *discrimination in lending* based on prohibited bases, including, among others, race, national origin, and ethnicity. *See* Equal Credit Opportunity Act, 15 U.S.C. §§ 1691 *et seq.*; Fair Housing Act, 42 U.S.C. §§ 3601 *et seq.* When fair lending violations, including redlining, are substantiated, the OCC takes enforcement or supervisory action and/or notifies other agencies with relevant supervisory and/or

enforcement jurisdiction, as appropriate. *See* FR 34,748 n.61. *see also Interagency Fair Lending Examination Procedures* (Aug. 2009) pp. 29-38, 42, *available at* https://www.ffiec.gov/pdf/fairlend.pdf.

### 3. The Former Comptroller's Alleged Pre-Rulemaking "Viewpoints" Do Not Support a Cognizable Theory of Unlawful Bias or Prejudgment

Finally, Plaintiffs allege that Former Comptroller Joseph Otting's banking experience gave him "very strong viewpoints" about CRA modernization and that this background demonstrates that he held bias which caused him to prejudge the matter and fail to meaningfully consider and respond to comments on the JNPR. Compl. ¶¶ 39-46, 76, 168. As a matter of law, however, Plaintiffs' allegations regarding Comptroller Otting's pre-rulemaking views cannot overcome the presumption of administrative regularity. *See Alaska Factory Trawler Ass'n v. Baldridge*, 831 F.2d 1456, 1467 (9th Cir. 1987) (requiring "clear and convincing showing that the agency member has an unalterably closed mind on matters critical to the disposition of the proceeding"). Courts presume that agency officials are "objective and capable of judging a particular controversy fairly on the basis of its own circumstances." *See United Steelworkers of Am., AFL-CIO-CLC v. Marshall*, 647 F.2d 1189, 1208 (D.C. Cir. 1980) (internal quotations omitted). "[M]ere proof that [an agency official] has taken a public position, *or has expressed strong views*, or holds an underlying philosophy with respect to an issue in dispute cannot overcome that presumption." *Id.* (emphasis added); *see also State v. Bureau of Land Mgmt.*, 286 F. Supp. 3d 1054, 1071 & n.6 (N.D. Cal. 2018). Recognizing that an official's presence within the agency reflects the political judgment of the President and Senate, courts have sternly rejected the notion that agency officials who have expressed opinions as to the correct course of future agency actions should be disqualified from rulemakings. *See e.g., Ass'n of Nat'l Advertisers, Inc. v. Fed. Trade Comm'n*, 627 F.2d 1151, 1173 (D.C. Cir. 1979) ("an expression of opinion prior to the issuance of a proposed rulemaking does not, without more, show that an agency member cannot maintain an open mind during the hearing stage of the proceeding"). Thus, any statements that Comptroller Otting made *prior to the issuance of* the JNPR cannot evidence that he was insufficiently open-minded throughout the rulemaking. It is both legitimate and expected that Comptroller Otting would have formed policy opinions throughout his banking career and shared these opinions in public forums; and having done so in no way indicates an

unwillingness to be persuaded on matters relevant to the Final Rule. *See Lead Indus. Ass'n, Inc. v. Envt'l Prot. Agency*, 647 F.2d 1130, 1179 (D.C. Cir. 1980) ("[a]gency decisionmakers are appointed precisely to implement statutory programs, and so inevitably have some policy preconceptions"). Accordingly, any claim of prejudgment, including failure to consider public comments, based on viewpoints allegedly held by Comptroller Otting prior to the issuance of the JNPR must be dismissed as a matter of law.

## CONCLUSION

Plaintiffs have not met their burden to demonstrate that they have standing to sue or, in the alternative, that they raise claims within the zone of interests of the relevant statute. Accordingly, Defendants are entitled to judgment as a matter of law and the Court should grant Defendants' Motion to Dismiss the Plaintiffs' Complaint with prejudice. In the second alternative, Count One of the Complaint should be dismissed with prejudice, in part, for failure to state a claim upon which relief can be granted.

Dated: August 31, 2020

Respectfully submitted,

*/s/ Ashley W. Walker*
JONATHAN GOULD (DC Bar No. 477569)
Senior Deputy Comptroller and Chief Counsel
BAO NGUYEN (NC Bar No. 39946)
Principal Deputy Chief Counsel
GREGORY F. TAYLOR (DC Bar No. 417096)
Director of Litigation
PETER C. KOCH (IL Bar No. 6225347)
Assistant Director of Litigation
ASHLEY W. WALKER (DC Bar No. 488126)
Counsel
ALISSA V. SAGRI (MD No. 0812180099)
Counsel
AMBER N. MELTON (MD No. 1405200002)
Counsel
HANNAH E. HICKS (AL Bar No. 9577S61W)
Attorney
Office of the Comptroller of the Currency
400 7th Street, SW
Washington, D.C. 20219
Telephone: (202) 649-6300
Facsimile: (202) 649-5709
ashley.walker@occ.treas.gov

*Attorneys for Defendants*

DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS PLAINTIFFS' COMPLAINT
CASE NO. 20-cv-04186-SK

33