Jeffrey B. Dubner (DC Bar No. 1013399)
(admitted *pro hac vice*)
jdubner@democracyforward.org
Michael C. Martinez (State Bar No. 275581)
mmartinez@democracyforward.org
Sean A. Lev (DC Bar No. 449936)
(admitted *pro hac vice*)
slev@democracyforward.org
Democracy Forward Foundation
P.O. Box 34553
Washington, DC 20043
Telephone: (202) 448-9090
Facsimile: (202) 701-1775

Sarah A. Good (State Bar No. 148742)
sgood@fbm.com
Anthony Schoenberg (State Bar No. 203714)
tschoenberg@fbm.com
Eric D. Monek Anderson (State Bar No. 320934)
emonekanderson@fbm.com
Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
Telephone: (415) 954-4400
Facsimile: (415) 954-4480

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| NATIONAL COMMUNITY REINVESTMENT COALITION; CALIFORNIA REINVESTMENT COALITION,<br><br>Plaintiffs,<br><br>v.<br><br>BRIAN P. BROOKS, Acting Director, Office of the Comptroller of the Currency, in his official capacity; OFFICE OF THE COMPTROLLER OF THE CURRENCY,<br><br>Defendants. | Case No. 20-cv-04186-KAW<br><br>**PLAINTIFFS' RESPONSE TO DEFENDANTS' SUPPLEMENTAL BRIEF** |

The new Notice of Proposed Rulemaking ("NPR"), 85 Fed. Reg. 78,258 (Dec. 4, 2020), issued by the Office of the Comptroller of the Currency ("OCC") has no bearing on any issues that the Court must decide in this case. With the exception of potentially mooting a small subpart of one claim, it would not change any of the flaws identified in Plaintiffs' Complaint. At most, the NPR—if finalized—would affect the *amount* of harm caused by the 2020 Final Rule, but in no circumstance would it eliminate it altogether. It is thus irrelevant to standing, because even a "minimal" injury conveys standing. *Preminger v. Peake*, 552 F.3d 757, 763 (9th Cir. 2008). Nor does it affect ripeness, because banks *right now* can get Community Reinvestment Act ("CRA") credit for activities for which they could not previously obtain credit, and many banks *right now* can stop providing data on which Plaintiffs rely. Moreover, as a general matter, the existence of a *proposal* to amend a final rule does not make a challenge to the operative rule unfit.

For these and the other reasons explained below, neither the NPR nor the FAQs undercut Plaintiffs' standing or the case's ripeness, and the Court should deny Defendants' motion.

## I. The NPR Has Little If Any Effect on the Issues Before the Court

Defendants do not claim that the NPR has any effect on the substance of Plaintiffs' claims that the Final Rule was arbitrary and capricious, not in accordance with law, and issued without necessary procedures. Nor could they. The vast majority of the flaws identified by Plaintiffs— most importantly, the expansion of qualifying activities, the redefinition of assessment areas and the tolerance of failure in 20 or 50 percent of those areas, the minimization of the services test, the elimination of the right to comment on banks' CRA performance, and the elimination of public access to significant bank data, *see* Pls.' Opp. to Defs.' Mot. to Dismiss ("Pls. Opp."), ECF No. 35 at 6-9—will be completely unchanged if the NPR is finalized. For the reasons previously stated, those claims are ripe today and Plaintiffs have standing to raise them. *See id.* at 12-28.

Far from changing any of those core flaws in the Final Rule, the NPR's main proposal is to establish an "approach" for choosing numerical thresholds for certain benchmarks that were omitted from the Final Rule. *See* 85 Fed. Reg. at 78,258. As they did in their principal briefing, Defendants make much of the fact that Plaintiffs referred to the absence of these benchmarks in five paragraphs of their 176-paragraph Complaint. *See, e.g.*, Defs.' Supp. Br. in Supp. of Defs.'

Mot. to Dismiss Pls.' Compl. ("Defs.' Supp."), ECF No. 41 at 2. Defendants' suggestion that Plaintiffs' claims cannot be adjudicated—and a substantial risk of harm to Plaintiffs cannot be recognized—until the benchmarks have been finalized is belied by Plaintiffs' actual discussion of the benchmarks. Plaintiffs' criticism was that "OCC's decision to adopt the framework despite its admitted inability to identify the specific numerical benchmarks, thresholds, and minimums needed to operationalize it is arbitrary and capricious . . . ." Compl., ECF No. 1, ¶ 125. Plaintiffs never suggested that choosing appropriate benchmarks might eliminate the harm to Plaintiffs caused by the many other flaws in the Final Rule; they merely argued that the decision to finalize the Final Rule without the benchmarks was itself arbitrary and capricious.

Thus, the *only* way that finalizing the benchmarks would affect Plaintiffs' claims is by arguably mooting this one component of Plaintiffs' arbitrary and capricious argument.[1] The possibility of that one piece of Plaintiffs' argument falling away does not affect any other issue in the case, and provides no reason to dismiss the entire case as unripe. *See, e.g.*, *Wolfson v. Brammer*, 616 F.3d 1045, 1066-67 (9th Cir. 2010) (reversing dismissal where one claim was ripe and one was unripe); *Bayer v. Neiman Marcus Grp., Inc.*, 861 F.3d 853, 868-75 (9th Cir. 2017) (reversing dismissal as moot where only three of plaintiff's four claims were moot).

Beyond that, Defendants' standing argument appears to be based on the false premise that the benchmarks, if set at the right level, could entirely mitigate the risk of harm to Plaintiffs. But wherever the benchmarks are set, banks will still be able to get credit for activities that were not previously eligible for credit, and will still be able to ignore or redefine many of their assessment areas. *See* Pls.' Opp. at 6-8. Under the framework established by the OCC, any benchmark will allow banks to reduce their investment in the kinds of community development activities that Plaintiffs and their members need and provide. Wherever the benchmarks are set (a question on which the NPR is entirely silent), banks could meet those benchmarks by claiming credit for

---

[1] Even that depends on the dubious proposition that subsequent amendments can remove the taint of an arbitrary and capricious rulemaking process. *Cf. CTS Corp. v. E.P.A.*, 759 F.3d 52, 64 (D.C. Cir. 2014) (holding that whether rule is arbitrary and capricious is evaluated on record before the agency at the time of its decision, not subsequent developments). In any event, the Court need not resolve that issue at this time.

PLAINTIFFS' RESPONSE TO DEFENDANTS'  2
SUPPLEMENTAL BRIEF
Case No. 20-cv-04186-KAW

multimillion-dollar deals with only passing benefit to low- and moderate-income communities; wherever they are set, banks will still be free to ignore 20 or even 50 percent of their assessment areas. And fatally for Defendants' argument, the change to the definition of qualifying activities is *immediately* effective. *See* Defs.' Supp. at 3 (acknowledging that "examiners will apply the Final Rule" to evaluate community development activities); *see also* Pls.' Opp. at 27. Thus, regardless of the benchmarks ultimately set, the rules challenged here provide incentives for banks *right now* to forgo the grants and loans on which Plaintiffs rely in favor of larger, more lucrative deals with at best attenuated benefits. This injury establishes standing. *See Dep't of Comm. v. New York*, 139 S. Ct. 2551, 2566 (2019) (standing shown where plaintiffs allege "that third parties will react in predictable ways" that harm plaintiffs); Pls.' Opp. at 17-18.

Moreover, even if the selection of a benchmark could reduce the magnitude of the harm to Plaintiffs, their members, and their members' communities, it would not entirely eliminate it. At best, Defendants could argue that the choice of a benchmark might affect the *amount* of harm. That is irrelevant to standing, where even "an identifiable trifle is sufficient." *Preminger*, 552 F.3d at 763 (internal quotation omitted). "The injury may be minimal," *id.*, and there is no plausible argument that the NPR, if finalized, would reduce the substantial risk of harm to Plaintiffs to zero.

For a similar reason, the NPR's proposal that banks whose performance "precipitously decreases by 10 percent" will "risk having their assigned ratings adversely impacted," 85 Fed. Reg. at 78,262, would have no bearing on Plaintiffs' standing. It would do nothing whatsoever to protect against decreases as high as 9.99 percent—which could be tens or even hundreds of millions of dollars, depending on the size of the bank. Nor would it protect against sustained (rather than "precipitous") declines that exceed 10 percent. In either case, the harm would be well beyond the "minimal" threshold necessary for standing. *Preminger*, 552 F.3d at 763.[2]

---

[2] It is also unclear when a decline would be measured and against what. The proposal in the NPR is ambiguous and could be read to measure declines against performance as of the benchmarks' issuance or the first evaluation. *See* 85 Fed. Reg. at 78,262, 78,266-67. Defendants' brief suggests the latter interpretation. *See* Defs.' Supp. at 5 (referring to a decline "*following* implementation of the General Performance Standards" and stating that the General Performance Standards will be implemented "in 2023" (emphasis added)). If this is the correct interpretation, the proposal would

PLAINTIFFS' RESPONSE TO DEFENDANTS'
SUPPLEMENTAL BRIEF
Case No. 20-cv-04186-KAW

3

In any event, the NPR is just a *proposed* rule. The existence of a proposal to amend an existing, effective rule typically does not render that rule unfit for review. *See, e.g.*, *Chamber of Com. v. U.S. Dep't of Labor*, 885 F.3d 360 (5th Cir. 2018) (vacating rule even though agency had already stayed the rule and invited comment on replacing it). It is speculative to suggest that a rule that Defendants may never finalize will change the effect of a rule that is already on the books—especially when the proposed rule does not even contemplate amending the vast bulk of the provisions that are alleged to be unlawful and harmful. Moreover, allowing agencies to evade review merely by proposing to amend one provision in a final rule would provide the federal government with a tool to forestall judicial review in virtually every case.

## II.   The FAQs Do Not Affect Any Issues Before the Court

Defendants also discuss a set of FAQs that the OCC posted online in November, which they had not previously asserted had any relevance to this case, and which are not encompassed by the Court's supplemental briefing order. As a preliminary matter, it is questionable whether the FAQs can have *any* bearing on Defendants' motion to dismiss, for three independent reasons. First, they postdate the Final Rule, and arbitrary and capricious regulations cannot be saved by subsequent agency statements. *See CTS Corp.*, 759 F.3d at 64. Second, they postdate the Complaint, and "standing turns on the facts as they existed at the time the plaintiff filed the complaint." *Skaff v. Meridien N. Am. Beverly Hills, LLC*, 506 F.3d 832, 838 (9th Cir. 2007) (citation omitted). Third, they are not binding on the agency and could be changed at any time.

But even assuming the FAQs are relevant and properly before the Court, they do not support Defendants' argument. First, the FAQs show that OCC examiners are *already* (as of October 1, 2020) considering activities for which banks could not receive credit under the prior rule, including the expanded range of qualifying activities and loans "not otherwise considered under the [pre-Final Rule] lending test." OCC Bulletin 2020-99, CRA: Key Provisions of the June 2020 CRA Rule and Frequently Asked Questions ("FAQs") (Nov. 9, 2020) at FAQ 2 & 3, https://www.occ.gov/news-issuances/bulletins/2020/bulletin-2020-99.html; *see* Defs.' Supp. at 3.

---

do *nothing* to deter declines when banks are first examined under the new standards, and could even incentivize them, as that would set a lower baseline against which to measure future declines.

The expansion of qualifying activities is a significant driver of the harm to Plaintiffs and their members. *See* Pls.' Opp. at 6-7, 13-16. Defendants admit, as they must, that even under the FAQs those changes have already taken effect, making the risk of harm not just imminent but ongoing.

Second, Defendants assert that "GPS banks" (i.e., banks subject to the new general performance standards) will continue to report small business loan and small farm loan data under the prior regulation until 2023. Defs.' Supp. at 3-4 (citing FAQ 22). They fail to mention, however, that the FAQ explicitly says that banks formerly designated "large" that have assets of up to $2.5 billion "*will not* be required to collect or report data under the 1995 rule for calendar years 2021 forward." FAQ 22 (emphasis added). Thus, far from preventing ripeness, the FAQs confirm that the loss of essential data began on January 1, 2021, providing standing right now.

Even if Defendants were correct that none of the changes that harm Plaintiffs kick in until 2023, that would not make Plaintiffs' claims unripe or their standing any less concrete and particularized. A final rule is typically ripe for review upon issuance, which does not change just because regulated parties will come into compliance over a span of years. *See* Pls.' Opp. at 16-17.

### III. Defendants' New Case Law Does Not Support Their Arguments

Finally, Defendants' new cases on ripeness and standing are no more availing than those they located during principal briefing. *Winebarger v. Pennsylvania Higher Education Assistance Agency* involved allegations that by plaintiffs' own admission *could not* cause them harm for five years or more. 411 F. Supp. 3d 1070, 1087 (C.D. Cal. 2019). Here, the substantial risk of harm has already begun and will only increase as the date of mandatory compliance approaches. *See* Pls.' Opp. at 16-17, 27-28. And *Habeas Corpus Resource Center v. U.S. Department of Justice* involved allegations that death penalty regulations would affect plaintiffs' ability to counsel future clients *only if* the Attorney General took future action to certify state capital-counsel policies. 816 F.3d 1241, 1249-50 (9th Cir. 2016). No further action by Defendants is necessary for the harm to Plaintiffs, their members, and their members' communities to materialize.

### IV. Conclusion

For the foregoing reasons and those in Plaintiffs' Opposition to Defendants' Motion to Dismiss, the Court should deny Defendants' motion.

| | |
|---|---|
| Dated: January 4, 2021 | /s/ Jeffrey B. Dubner </br>Jeffrey B. Dubner (DC Bar No. 1013399) </br>(admitted *pro hac vice*) </br>jdubner@democracyforward.org </br>Michael C. Martinez (State Bar No. 275581) </br>mmartinez@democracyforward.org </br>Sean A. Lev (DC Bar No. 449936) </br>(admitted *pro hac vice*) </br>slev@democracyforward.org </br>Democracy Forward Foundation </br>P.O. Box 34553 </br>Washington, DC 20043 </br>Telephone: (202) 448-9090 </br>Facsimile: (202) 701-1775 </br></br>Sarah A. Good (State Bar No. 148742) </br>sgood@fbm.com </br>Anthony Schoenberg (State Bar No. 203714) </br>tschoenberg@fbm.com </br>Eric D. Monek Anderson (State Bar No. 320934) </br>emonekanderson@fbm.com </br>Farella Braun + Martel LLP </br>235 Montgomery Street, 17th Floor </br>San Francisco, California 94104 </br>Telephone: (415) 954-4400 </br>Facsimile: (415) 954-4480 </br></br>*Counsel for Plaintiffs* |