UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NATIONAL COMMUNITY REINVESTMENT COALITION, et al., <br><br> Plaintiffs, <br><br> v. <br><br> OFFICE OF THE COMPTROLLER OF THE CURRENCY, et al., <br><br> Defendants. | Case No. 4:20-cv-04186-KAW <br><br> **ORDER DENYING MOTION TO DISMISS** <br><br> Re: Dkt. No. 25 |

On August 31, 2020, Defendants United States Office of the Comptroller of the Currency and Acting Comptroller of the Currency Brian Brooks filed a motion to dismiss the complaint pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).

Upon review of the moving papers, the Court finds this matter suitable for resolution without oral argument pursuant to Civil Local Rule 7-1(b), and, for the reasons set forth below, DENIES Defendants' motion to dismiss.

## I. BACKGROUND

The National Community Reinvestment Coalition ("NCRC") and the California Reinvestment Coalition ("CRC") (collectively "Plaintiffs") filed this lawsuit under the Administrative Procedure Act, 5 U.S.C. § 702, to challenge as arbitrary and capricious the Final Rule, 85 Fed. Reg. 34734, issued by the Office of the Comptroller of the Currency ("OCC") on June 5, 2020, which revised the regulations implementing the Community Reinvestment Act, 12 U.S.C. § 2901 et seq. (Compl., Dkt. No. 1 ¶ 1.) Plaintiffs claim that the Final Rule "guts the Act and eviscerates the backing it provides to the low- and moderate income ("LMI") communities and communities of color that have long suffered from discrimination by financial institutions."

(Compl. ¶ 5.)

### A. The Community Reinvestment Act

In 1977, Congress passed the Community Reinvestment Act ("CRA") to address systemic discrimination in the provision of financial services to LMI neighborhoods and communities of color. (Compl. ¶ 2.) In the decades prior to the CRA, systemic discrimination manifested in the practice of redlining, wherein "banks and savings and loans will take their deposits from a community and instead of reinvesting them in that community, they will actually or figuratively draw a redline on a map around the areas." (Compl. ¶ 18.) Discrimination limited the flow of capital for homeownership and small businesses in LMI communities of color and denied opportunities for economic development to residents and business owners in those neighborhoods. (Compl. ¶ 17.)

To remedy the historic disinvestment in LMI neighborhoods and to ensure the provision of capital to LMI neighborhoods, the CRA imposes on banks a "continuing and affirmative obligation to help meet the credit needs of the local communities in which they are chartered." 12 U.S.C. § 2901(a)(3). The CRA instructs the OCC, the Federal Deposit Insurance Corporation ("FDIC"), and the Board of Governors of the Federal Reserve System ("Federal Reserve") to evaluate CRA performance, with a given bank's charter dictating which agency assesses that bank. *Id.* at § 2902(1). Specifically, OCC, FDIC, and the Federal Reserve "shall assess" a financial institution's "record of meeting the credit of its entire community, *including low- and moderate-income neighborhoods*...." 12 U.S.C. § 2903(a)(1) (emphasis added). These assessments must separately evaluate each metropolitan area in which a regulated bank maintains one or more branch office or deposit-taking facility, such as an ATM. *Id.* at § 2906(b)(1)(B), 2906(e)(1).

Historically, OCC, FDIC, and the Federal Reserve have acted in together and jointly issued uniform, robust regulations consistent with CRA's text and purpose. (Compl. ¶¶ 4, 26-28.) Now, however, FDIC and the Federal Reserve have refused to go along with the OCC's Final Rule, and continue to evaluate the state chartered banks and savings association that they regulate under the 1995 final rule. (Compl. ¶ 26.) The CRA framework now only applied by FDIC and the Federal Reserve—and applied for decades by OCC prior to the enactment of the Final Rule— guides bank

evaluations. (Compl. ¶ 29.)  Evaluations begin with a determination of the community needs in the area where the bank does business, known as "performance context." (Compl. ¶ 33.)  The agencies then apply performance standards to evaluate each of the bank's assessment areas, with an assessment area typically being the community around a bank office, branch, and/or "deposit-taking ATMs." (Compl. ¶ 30; *see* 12 C.F.R. § 25.41[1].)  Pursuant to the statute, banks are evaluated in each assessment area to ensure that they meet the credit needs of the "entire community" that they serve. (Compl. ¶ 30; *see* 12 U.S.C. § 2903(a)(1).)

Principally, the agencies' joint performance standards rely on three criteria: the lending test, investment test, and service test. (Compl. ¶ 31.)  The lending test evaluates the volume of a bank's mortgage, small business, small farm, community development, and some consumer lending activities, as well as the geographic distribution and income of borrowers. *Id.*; *see* 12 C.F.R. § 25.22.  The investment test evaluates a bank's community development activities by dollar amount, innovation, complexity, and responsiveness to community needs. (Compl. ¶ 31; *see* 12 C.F.R. § 25.23.)  The service test evaluates a bank's retail banking services, including financial education, the distribution of branches in LMI neighborhoods, and "the bank's record of opening and closing branches, particularly branches located in low- or moderate-income geographies or primarily serving low- or moderate-income individuals." (12 C.F.R. § 25.24; *see* Compl. ¶ 31.)

Following examination of a financial institution, the examining agency must prepare written CRA performance evaluation that states its conclusions under the regulatory assessment factors, discusses the facts and data supporting the conclusions reached, and describes the basis for rating the institution's CRA performance. *Id.* at § 2903.  The available ratings are "Outstanding record of meeting community credit needs," "Satisfactory record of meeting community credit needs," "Needs to improve record of meeting community credit needs," and "Substantial noncompliance in meeting community credit needs". *Id.* at § 2906(b)(2).  Receipt of a low or failing grade can affect a bank's future applications for new deposit facilities. *Id.* at § 2903(a)(2). The public and local governments also consider CRA ratings in determining which banks to

---

[1] All citations to the C.F.R. are to the version of the regulations in effect prior to October 1, 2020, the date the Final Rule was enacted.

3

1   patronize. (*See* Compl. ¶ 35.)

### B. Plaintiffs' CRA-related Missions and Programs

Plaintiffs NCRC and CRC are both nonprofit organizations focused on increasing financial investment in LMI communities, with CRC concentrated on California communities and NCRC working nationally. (Compl. ¶¶ 11-12.) Both are membership associations, together comprising more than 900 community reinvestment organizations, community development financial institutions, minority- and women-owned business associations, and social service providers. *Ids.* Plaintiffs and many of their members depend on CRA-qualifying grants and loans from OCC-regulated entities to provide lending, financial counseling, homeownership assistance, and other critical forms of investment in LMI communities. (Compl. ¶¶ 144-45, 156, 158.) Additionally, Plaintiffs expend substantial resources to negotiate with banks to obtain commitments to support the credit needs of LMI communities and communities of color (Compl. ¶¶ 138, 151), publish evidence-based reports developed from CRA data (Compl. ¶¶ 140, 147-48, 154, 160-61), and comment on banks' CRA performance and merger applications (Compl. ¶¶ 142, 154).

### C. The Final Rule

On September 5, 2018, OCC issued an Advance Notice of Proposed Rulemaking ("ANPR") on the CRA regulations. (Compl. ¶ 46, Ex. D.) NCRC and CRC, among many others, commented on the ANPR and cautioned that OCC's proposed approach would dilute benefits for LMI communities and diminish transparency. (Compl. ¶¶ 47-48.) Despite commenters' concerns, OCC and FDIC issued a Notice of Proposed Rulemaking ("NPR") in January 2020. (Compl. ¶ 51, Ex. E.) This break from the existing unified framework prompted Federal Reserve Chair Jerome Powell to opine that OCC's approach could "create confusion or … tension between the regimes," and the substance of the Proposed Rule led FDIC Director Martin J. Gruenberg to warn that it "would fundamentally undermine and weaken the Community Reinvestment Act." (Compl. ¶¶ 53, 56.) In response to the NPR, Plaintiffs commented on the proposal's adverse effects on LMI communities and inconsistency with the CRA's statutory purpose, as did many of their members. (Compl. ¶ 58.)

OCC received thousands of comments—the overwhelming majority of them negative—

and numerous requests to extend the comment period due to the COVID-19 pandemic and assess whether the pandemic's impact on LMI communities affected OCC's analysis. (Compl. ¶¶ 61, 70-75.) Nevertheless, OCC released the Final Rule on May 20, 2020, only six weeks after the close of the comment period. (Compl. ¶ 61; Final Rule, Compl., Ex. A.) Both FDIC and the Federal Reserve declined to join the Final Rule. (*See* Compl. ¶ 62.) Plaintiffs allege that, in promulgating the Final Rule, OCC failed to meaningfully engage with, evaluate, and respond to significant concerns raised by thousands of comments, including from Plaintiffs. (*See, e.g.*, Compl. ¶¶ 78, 82, 86-87, 89, 93, 95-97, 99, 105-106, 108, 114, 120-21, 136.) Instead, Plaintiffs allege that OCC largely adopted the approach it had chosen from the very beginning, but with certain harmful changes on which the public had no opportunity to comment. (Compl. ¶¶ 79, 90-91, 101, 107, 115.)

Furthermore, OCC failed to publish research it claimed supports issuance of the rule and data obtained in a request for information and failed to provide any substantive records of calls Comptroller of Currency Joseph Otting had with CEOs of 17 large banks. (Compl. ¶¶ 65-69.) OCC also failed to address the changes to the economic landscape caused by COVID-19, let alone suspend its rulemaking to gather data about the economic impact of the global pandemic and its disproportionate effects on LMI communities. (Compl. ¶¶ 70-75.) Otting, who was hostile to the CRA based on his prior experience as Chief Executive Officer of OneWest Bank, resigned from OCC the day after the Final Rule was published. (Compl. ¶¶ 39, 64.)

Plaintiffs allege that the Final Rule will reduce funding that previously flowed to LMI communities by allowing banks to claim credit for a wide array of activities that have negligible effects on LMI communities and funnel money away from those communities—the very neighborhoods the CRA was designed to protect. (Compl. ¶¶ 82-96.) First, the Final Rule permits banks to claim credit for financing "essential infrastructure" and "essential community facilities." (Compl. ¶ 83; Final Rule, 85 Fed. Reg. at 34794, 34796.) While infrastructure and other activities counted under the prior framework only if they "primarily benefit" LMI communities, the Final Rule now permits credit for these activities even where they only "partially" serve LMI communities. (Compl. ¶ 85.) The Final Rule also broadened the range of essential infrastructure

5

that can qualify to include, for example, bridges, and police stations, regardless of where they are located or who their primary beneficiaries are. (Compl. ¶ 83 (citing Final Rule, 85 Fed. Reg. at 34794, 34796).) The Final Rule also allows banks to receive credit for any financial education efforts, regardless of whether the intended beneficiary is LMI, and for affordable housing not occupied by LMI individuals. (Compl. ¶¶ 87-88.) Moreover, the Final Rule—in a change from the Proposed Rule—allows a bank to identify an area as a "CRA desert" and become eligible for a "multiplier" for any CRA activities in that area, with no opportunity for public comment or engagement on the bank's choice of CRA desert. (Compl. ¶ 90.) It also increases the size of businesses that qualify for CRA-eligible small business loans, as well as the maximum size of the loans themselves. (Compl. ¶ 96.) The net effect of these changes, and others identified in the complaint, is to reorient banks' CRA activities away from smaller and underserved communities in which they do business, particularly LMI communities. (Compl. ¶¶ 92-96.)

Second, the Final Rule also alters the "assessment areas," which are the geographic areas around bank offices, branches, and deposit-taking ATMs, where CRA examiners evaluate bank performance. (Compl. ¶¶ 97-108.) Despite the statutory requirement that OCC evaluate all metropolitan areas where a bank maintains any "facility … that accepts deposits," 12 U.S.C. § 2906(b)(1)(B), 2906(e)(1), the Final Rule included a last-minute change freeing banks from the requirement to designate assessment areas around deposit-taking ATMs. (Compl. ¶¶ 100-102.) Despite the widespread adoption of Internet banking, OCC required banks to designate deposit-based assessment areas only if they received more than 50 percent of their domestic deposits from areas where they had no branches or ATMs, and even then only in geographic areas where they receive more than 5 percent of their retail deposits. (Compl. ¶¶ 103-104.) Thus, even if a bank has a significant presence in a smaller city, if that bank maintains no branches there and is large enough that it does not take in more than 5 percent of its deposits in that area, the bank has no obligation to delineate an assessment area there and its CRA activities there (or lack thereof) will go unassessed. (Compl. ¶ 106.) In another last minute change, OCC allowed banks to designate deposit-based assessment areas at the state level, rather than requiring evaluation of the specific communities where they obtained deposits, allowing banks to fulfill CRA obligations without

6

lending a dime in smaller areas from which they received deposits and with LMI concentrations or that otherwise have been neglected. (Compl. ¶ 107.) A 2017 Federal Reserve study showed that when CRA exams no longer assess a metropolitan area or county, lending in LMI census tracts declines by up to 20 percent, so this change is significant. (*See* Compl. ¶ 23.)

Third, the Final Rule replaces the CRA's focus on the needs of local communities with a presumptive, quantitative performance standard dominated by pass/fail ratios and thresholds. (Compl. ¶¶ 109-30.) One component of the new performance standard for large banks is the "retail lending distribution test," which allows banks to succeed on a pass/fail basis based on peer or demographic comparators and is limited only to "major" lending product lines from the bank's perspective. (Compl. ¶ 113.) The distribution test does not account for whether that line is major to a particular LMI community, because a bank may be a major lender in a small, rural or underserved community even if that product line is not a major line for the bank. (Compl. ¶¶ 114-15.) Despite the importance of bank branches to lending and economic development in LMI communities, and their prominent status in the CRA, *see* 12 U.S.C. § 2906, the Final Rule did away with the service test, the main way that the previous regulations evaluated how banks serve communities' "need for credit services as well as deposit services," 12 U.S.C. § 2901(a)(2). Instead, the Final Rule makes local branches barely one percent of banks' CRA score. (Compl. ¶¶ 117, 121.) Finally, the Final Rule allows banks to receive a "satisfactory" or "outstanding" rating even if, depending on the bank, it fails in 20 or even 50 percent of the areas in which the bank receives deposits. (Compl. ¶ 122.) As a result of these changes, Plaintiffs allege that the Final Rule enables banks to reduce their investments in LMI communities, yet still pass their CRA exams, which harms Plaintiffs and their members, whose operations rely on CRA-qualifying funding and other commitments from OCC-regulated banks. (*See* Compl. ¶¶ 138-39, 144-45, 151, 156.)

Finally, Plaintiffs allege that the Final Rule limits public input and transparency, because it reduces the amount of data available to the public and organizations like Plaintiffs that produce reports on CRA compliance. (Compl. ¶¶ 56, 131-36.) In fact, the Final Rule eliminated the requirement that CRA examiners consider "any written comments about the bank's CRA

1 performance submitted to the bank or the OCC." 12 C.F.R. § 25.21(b)(6).  Instead, the Final Rule
2 requires examiners to consider only "written comments about assessment area needs and
3 opportunities submitted to the bank or the OCC," removing opportunity for public input on bank
4 performance. 85 Fed. Reg. at 34803.  The Final Rule also no longer requires public dissemination
5 of banks' small business and small lending ("SLBF") data at a county and census-tract level. *See*
6 *id.* Nor does it require reporting of loan sizes by bank. *Cf.* 12 C.F.R. § 25.42(b)(1), 25.42(h) *with*
7 85 Fed. Reg. at 34807.  Plaintiffs allege that this impairs their ability to produce informed analyses
8 of banks' CRA-qualifying activities. (Compl. ¶¶ 140, 147-48.)
9       The Final Rule went into effect on October 1, 2020. 85 Fed. Reg. at 34734.

### D. Procedural Background

Plaintiffs filed their complaint on June 25, 2020. (Compl., Dkt. No. 1.)  On August 31, 2020, Defendants filed a motion to dismiss. (Defs.' Mot., Dkt. No. 25.)  On September 28, 2020, Plaintiffs filed an opposition. (Pls.' Opp'n, Dkt. No. 35.)  On October 13, 2020, Defendants filed a reply. (Defs.' Reply, Dkt. No. 36.)  On December 9, 2020, Defendants filed a notice of new proposed rulemaking. (Dkt. No. 38.)  On December 16, 2020, the Court ordered the parties to provide supplemental briefing regarding the effect of the proposed rulemaking on the instant motion. (Dkt. No. 40.)  On December 28, 2020, Defendants filed a supplemental brief. (Defs.' Br., Dkt. No. 41.)  On January 4, 2021, Plaintiffs filed a supplemental brief. (Pls.' Br., Dkt. No. 42.)

## II.   LEGAL STANDARD

### A.   Motions to Dismiss pursuant to Rule 12(b)(1)

Federal Rule of Civil Procedure 12(b)(1) allows a party to challenge a federal court's subject matter jurisdiction.  As the party invoking subject matter jurisdiction of the federal court, the plaintiff bears the burden of establishing that the court has the requisite subject matter jurisdiction to grant the relief requested. *See Kokkonen v. Guardian Life Ins. Co. of America*, 511 U.S. 375, 377, 114 S.Ct. 1673, 128 L.Ed.2d 391 (1994). A complaint will be dismissed if, looking at the complaint as a whole, it appears to lack federal jurisdiction either "facially" or "factually." *Thornhill Publ'g Co., Inc. v. General Tel. & Elecs. Corp.*, 594 F.2d 730, 733 (9th Cir. 1979); *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004) ("A Rule 12(b)(1) jurisdictional

attack may be facial or factual.").

A challenge to subject matter jurisdiction is facial attack where the moving party "asserts that the allegations contained in a complaint are insufficient on their face to invoke federal jurisdiction." *Safe Air for Everyone*, 373 F.3d at 1039. The court "resolves a facial attack as it would a motion to dismiss under Rule 12(b)(6): Accepting the plaintiff's allegations as true and drawing all reasonable inferences in the plaintiff's favor, the court determines whether the allegations are sufficient as a legal matter to invoke the court's jurisdiction." *Leite v. Crane Co.*, 749 F.3d 1117, 1121 (9th Cir. 2014).

### B.  Motions to Dismiss pursuant to Rule 12(b)(6)

Under Federal Rule of Civil Procedure 12(b)(6), a party may file a motion to dismiss based on the failure to state a claim upon which relief may be granted. A motion to dismiss under Rule 12(b)(6) tests the legal sufficiency of the claims asserted in the complaint. *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001).

In considering such a motion, a court must "accept as true all of the factual allegations contained in the complaint," *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam) (citation omitted), and may dismiss the case or a claim "only where there is no cognizable legal theory" or there is an absence of "sufficient factual matter to state a facially plausible claim to relief." *Shroyer v. New Cingular Wireless Servs., Inc.*, 622 F.3d 1035, 1041 (9th Cir. 2010) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 677-78 (2009); *Navarro*, 250 F.3d at 732) (internal quotation marks omitted).

A claim is plausible on its face when a plaintiff "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citation omitted). In other words, the facts alleged must demonstrate "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "Threadbare recitals of the elements of a cause of action" and "conclusory statements" are inadequate. *Iqbal*, 556 U.S. at 678; *see also Epstein v. Wash. Energy Co.*, 83 F.3d 1136, 1140 (9th Cir. 1996) ("[C]onclusory allegations of law and unwarranted inferences are insufficient to defeat a motion to dismiss for failure to state a

claim."). "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully . . . When a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557) (internal citations omitted).

Generally, if the court grants a motion to dismiss, it should grant leave to amend even if no request to amend is made "unless it determines that the pleading could not possibly be cured by the allegation of other facts." *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000) (citations omitted).

### III.     DISCUSSION

Defendants move to dismiss under Rule 12(b)(1) for lack of standing and that the claims are not ripe. (Defs.' Mot. at 10.)  Alternatively, Defendants argue that the complaint is subject to dismissal under Rule 12(b)(6) because they do not fall within CRA's "zone of interests" and do not state a claim under the APA. *Id.* at 23-25.

#### A.     Motion to Dismiss under Rule 12(b)(1)

Defendants' arguments constitute a facial attack on Plaintiffs' standing to prosecute this case, so the Court must accept all allegations as true and draw all reasonable inferences in Plaintiffs' favor. *See Leite,* 749 F.3d at 1121.

##### i.     Standing

Defendants contend that Plaintiffs fail to establish standing on behalf of themselves (organizational standing) or on behalf of their members (associational standing), thereby depriving the undersigned of subject matter jurisdiction. (Defs.' Mot. at 12.)  Plaintiffs have the burden of establishing constitutional standing by showing: "(1) an injury in fact that is (a) concrete and particularized and (b) actual or imminent; (2) causation; and (3) a likelihood that a favorable decision will redress the injury." *Wolfson v. Brammer*, 616 F.3d 1045, 1056 (9th Cir. 2010) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)).

###### a.     Organizational Standing

Plaintiffs argue that the complaint sets forth

> at least four independent categories of injury that they and/or their members will likely suffer from the Final Rule: (1) they will face increased competition for CRA funding; (2) their mission-driven activities will become more expensive and they will need to divert more resources to certain activities; (3) they will lose information that they use in their regular activities; and (4) they will lose opportunities to comment on banks' CRA evaluations. *See* Compl. ¶¶ 137-61.

(Pls.' Opp'n at 12-13.)

### 1. Injury in Fact

Injury in fact is established when there is "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560 (internal quotations and citations omitted); *see also Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S.Ct. 1377, 1386 (2014) ("The plaintiff must have suffered or be imminently threatened with a concrete and particularized 'injury in fact' that is fairly traceable to the challenged action of the defendant[.]").

Here, Defendants contend that Plaintiffs fail to generally allege that they will be required to divert resources or change their behavior, and instead merely speculate that some future impact will result in them spending more money. (Defs.' Mot. at 13.)

In opposition, Plaintiffs argue that it is undisputed that the Final Rule will force them and their members "'to compete with large-scale infrastructure and similar projects' when they seek funding for CRA activities from OCC-regulated banks." (Pls.' Opp'n at 13 (quoting Compl. ¶ 153; citing Compl. ¶ 141).) Under the doctrine of "competitor standing," "economic actors suffer an injury in fact when agencies lift regulatory restrictions on their competitors or otherwise allow increased competition against them." *Int'l Bhd. of Teamsters v. U.S. Dep't of Transp.*, 861 F.3d 944, 950 (9th Cir. 2017) (quoting *Sherley v. Sebelius*, 610 F.3d 69, 72 (D.C. Cir. 2010)). A plaintiff need not show that it has actually or will certainly suffer a financial loss, because "the injury is the increase in competition rather than the ultimate denial of an application, the loss of sales, or the loss of a job." *Planned Parenthood of Greater Wash. & N. Ida. v. HHS*, 946 F.3d 1100, 1108 (9th Cir. 2020). Thus, "[a]n agency action that increases competition tilts the playing field for parties that were already competing, and those parties suffer an injury-in-fact." *Id.* at 1108 (citing *City of Los Angeles v. Barr*, 929 F.3d 1163, 1173 (9th Cir. 2019)).  This includes

competing for grants and awards. *See Planned Parenthood*, 946 F.3d at 1108.

Here, Plaintiffs allege that the Final Rule's expansion of CRA-qualifying activities will lead to divestment in the communities the CRA was enacted to protect, because it will allow banks to receive CRA credit "for infrastructure projects and similar activities whose benefits to LMI communities are attenuated and speculative at best, for providing financial education to upper-income individuals, for financing large corporate farms, and for financing housing that may be occupied by upper-income individuals." (Pls.' Opp'n at 1 (quoting Compl. ¶ 80(a)).)

In reply, Defendants argue that the competitor standing doctrine does not apply, because Plaintiffs are not in competition with other parties under the CRA. (Defs.' Reply at 5.) Specifically, Defendants argue that Plaintiffs fail to allege or show "that they are (i) engaged in the same business with other potential recipients of CRA funding (their "alleged competitors"), (ii) engaged in direct competition for customers and/or profits with any alleged competitors; or (iii) any actual instance of losing business opportunities." (Defs.' Reply at 5-6.) The Court disagrees.

To the contrary, Plaintiffs sufficiently allege that they and their members compete for OCC-regulated banks' CRA dollars. (*See* Pls.' Opp'n at 14.)[2] One example is that NCRC's Housing Counseling Network comprises organizations that receive grants directly from banks to fund their services. *Id.* (citing Compl. ¶ 145.) As alleged in the complaint, these more than 50 Network member organizations "help[] potential homeowners in LMI communities secure non-predatory mortgage loans." (Compl. ¶ 145.) Plaintiffs allege that if banks can achieve a passing CRA score through other means that only "partially" benefit LMI communities, a bank can suspend smaller-dollar grants for housing counseling in LMI communities. *Id.* It is enough to allege that these core activities will now have to compete with investment opportunities that could not previously receive CRA credit. (*See* Pls.' Opp'n at 14; *see, e.g.,* Compl. ¶¶ 145, 150, 153.)

Accordingly, the Court finds that Plaintiffs have adequately alleged an injury in fact under the competitor standing doctrine.

---

[2] The fact that the pool of CRA funding is not fixed is also not dispositive. (*See* Defs.' Reply at 6.) That the Final Rule will increase competition for grants and financing is enough to confer competitor standing.

2. Causation and Redressability

"Causation and redressability are generally implicit in injury-in-fact under the competitor standing doctrine," because a judicial decree reversing the rule would remove the competition thereby redressing the injury. *Planned Parenthood of Greater Washington & N. Idaho v. U.S. Dep't of Health & Human Servs.*, 946 F.3d 1100, 1108 (9th Cir. 2020) (citing *Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville, Fla.*, 508 U.S. 656, 666 n. 5, 113 S. Ct. 2297, 2303, 124 L. Ed. 2d 586 (1993)). Here, the injury of greater competition is caused by the Final Rule and would be redressed if the Final Rule were reversed.

Accordingly, Plaintiffs have sufficiently alleged standing.

b. Associational Standing

Since the Court finds that Plaintiffs satisfy organizational standing, so it need not address associational standing.

### ii. Ripeness

As an initial matter, the Final Rule took effect on October 1, 2020. Even so, Defendants argue that the claims are not ripe, because Plaintiffs' alleged injuries are "based on assertions that banks will perform fewer or less valuable CRA activities…are speculative because the OCC has not finalized the numeric performance thresholds and benchmarks under the Final Rule's general performance standards." (Defs.' Mot. at 21.)

In opposition, Plaintiffs argue that the claims are ripe for review, because the Final Rule threatens them and their members because banks will be able to claim CRA credit for newly eligible activities. (Pls.' Opp'n at 26.)

The Court is not persuaded by Defendant's supplemental brief that the recent proposed rulemaking moots this lawsuit or makes the claims unripe, as it would merely result in the undertaking of "additional rulemaking to calibrate numeric measures for implementing the Final Rule's revised framework for CRA performance evaluations." (Defs.' Br. at 2.) It certainly does not mean that the Final Rule at issue is not arbitrary and capricious or procedurally improper. Indeed, as Plaintiffs argue, "[a]t most, the NPR—if finalized—would affect the *amount* of harm caused by the 2020 Final Rule, but in no circumstance would it eliminate it altogether." (Pls.' Br.

at 2.)  Thus, the Court finds that the claims are constitutionally ripe.

In regards to prudential ripeness, the Ninth Circuit considers it to be "a disfavored judge-made doctrine that 'is in some tension with [the Supreme Court's] recent reaffirmation of the principle that a federal court's obligation to hear and decide cases within its jurisdiction is virtually unflagging.'" *Fowler v. Guerin*, 899 F.3d 1112, 1116 n.1 (9th Cir. 2018) (quoting *Susan B. Anthony List v. Driehaus*, ––– U.S. –––, 134 S. Ct. 2334, 2347, 189 L. Ed. 2d 246 (2014) (citations omitted)).  Thus, the undersigned follows other courts in this district who have declined to address prudential ripeness when constitutional ripeness is satisfied. *See, e.g., State ex rel. Becerra v. Sessions*, 284 F. Supp. 3d 1015, 1031 (N.D. Cal. 2018).

### B.    Motion to Dismiss under Rule 12(b)(6)

#### i.    Prudential Standing

Defendants argue that the complaint is subject to dismissal because the claims and allegations of potential harm from the Final Rule fall outside of the CRA's zone of interests, thereby requiring that the complaint be dismissed pursuant to Rule 12(b)(6). (Defs.' Mot. at 23.)

In opposition, Plaintiffs argue that they plausibly allege prudential standing, because the zone-of-interests test is not especially demanding, and permits courts "to reject a plaintiff with Article III standing only if its 'interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit.'" (Pls.' Opp'n at 25 (quoting *Clarke v. Secs. Indus. Ass'n*, 479 U.S. 388, 399 (1987)).  The Court agrees.

Based on the allegations in the complaint, the Court finds that Plaintiffs and their members' interests satisfy the zone-of-interests test, because they receive grants and loans for which banks obtain CRA credit, making them direct beneficiaries of the statute.

Accordingly, Plaintiffs have prudential standing to pursue this litigation.

#### ii.   Whether dismissal is proper due to a failure to state a claim of unlawfulness under the APA.

Alternatively, Defendants move to dismiss count one for failure to state a claim under the APA. (Defs.' Mot. at 25.)  The Court, however, does not have the benefit of the administrative

record, and these arguments go directly to the merits of the case, rendering this argument more appropriately addressed on summary judgment. Since the Court declines to convert this motion to dismiss into a motion for summary judgment, Defendant's motion to dismiss under Rule 12(b)(6) is denied.

### IV.    CONCLUSION

For the reasons set forth above, Defendants' motion to dismiss is denied. Defendants shall file an answer within 21 days of this order.

IT IS SO ORDERED.

Dated: January 29, 2021

_____
KANDIS A. WESTMORE
United States Magistrate Judge

15